# EXHIBIT H

STATE OF MICHIGAN
IN THE 42nd CIRCUIT COURT FOR THE COUNTY OF MIDLAND

HERON COVE ASSOCIATION, et al,                    Case No. 24-2751-AA

        Appellants,

                                       Hon. Michael J. Beale

v.

MIDLAND COUNTY BOARD OF
COMMISSIONERS, and GLADWIN
COUNTY BOARD OF
COMMISSIONERS, and FOUR LAKES
TASK FORCE

        Appellees.

---

Michael D. Homier (P60318)                 Joseph W. Colaianne (P47404)
Laura J. Genovich (P72278)                 Zachary C. Larsen (P72189)
Keith T. Brown (P84193)                    Lauren K. Burton (P76471)
FOSTER, SWIFT, COLLINS & SMITH, PC         CLARK HILL PLC
*Attorneys for Appellant*                  *Attorneys for Appellees*
1700 E. Beltline Ave. NE, Suite 200        215 S. Washington Square, St. 200
Grand Rapids, MI 49525                     Lansing, MI 48933
(616) 726-2200                             (517) 318-3100
mhomier@fosterswift.com                    Jcolaianne@clarkhill.com
lgenovich@fosterswift.com                  zlarsen@clarkhill.com
kbrown@fosterswift.com                     lburton@clarkhill.com

---

**APPELLANTS' BRIEF ON APPEAL**

**ORAL ARGUMENT REQUESTED**

1

# **Table of Contents**

Statement of Jurisdiction.................................................................................... 4

Statement of Questions Presented...................................................................... 5

Statement of Facts.............................................................................................. 6

Standard of Review ............................................................................................ 9

Argument ........................................................................................................... 9

    I.    Appellants' decisions were not supported by competent, material, and substantial evidence on the whole record............................................................................................ 9

    A. To be valid, special assessments must lead to an increase in market value that is proportional to the assessment………………………………………………………………9

    B. Appellees' methodology is devoid of any consideration of proportionality and benefit conferred to Appellants' properties as opposed to the community as a whole. .........................11

    C. By Appellees' own words, the Four Lakes have a tremendous regional impact........... 12

    D. Appellees' apportioned the assessment without regard to proportionality................... 13

    II.    The special assessments are a taking without due process of law. .................................... 18

Conclusion ....................................................................................................... 24

WORD COUNT CERTIFICATION ................................................................ 25

### Index of Authorities

**Cases**

*Ahearn v Bloomfield Charter Twp*, 235 Mich App 486, 496-97; 597 NW2d 858 (1999) ............. 8

*Dixon Road Group v City of Novi¸* 426 Mich 390, 403; 395 NW2d 211 (1986)...................... 7, 13

*In re Project Cost and Special Assessment Roll for Chappel Dam*, 282 Mich App 142, 150; 762 NW2d 192 (2009) ................................................................................................ 9, 14, 15

*Kadzban v City of Grandville*, 442 Mich 495; 502 NW2d 299 (1993)........................................ 7

*Matthews v Elridge*, 424 US 319, 335; 96 S Ct 893; 47 L Ed 2d 18 (1976) .............................. 13

*Mays v Snyder*, 323 Mich 79; 916 NW2d 227 (2018) ................................................................ 18

*Michigan's Adventure, Inc v Dalton Twp*, 290 Mich App 328, 335; 802 NW2d 353 (2010) ... 7, 10

*Sessa v Macomb Co*, 220 Mich App 279; 559 NW2d 70 (1996)................................................ 16

**Statutes**

MCL 211.78a-m ........................................................................................................................... 18

MCL 280.155-59 .......................................................................................................................... 19

MCL 324.30704 ............................................................................................................................. 7

MCL 324.30711 ............................................................................................................................. 7

MCL 324.30714 ....................................................................................................................... 15, 16

**Regulations**

Mich Admin Code, R 792.10201 *et seq* ...................................................................................... 19

**Constitutional Provisions**

Const. 1963, art 10, §2 ................................................................................................................. 18

Const. 1963, art. 6, § 28 ................................................................................................................. 6

**<u>Statement of Jurisdiction</u>**

On February 20, 2024, Appellants timely claimed an appeal from the February 6, 2024 decisions of Appellees Midland and Gladwin Counties to approve a 5-year operation and maintenance project cost and special assessment roll, and capital improvement project cost and special assessment roll.  Appellants timely filed an amended claim on February 21, 2024.  This Court has jurisdiction over this appeal under MCL 324.30701(c) and MCL 324.30714(4).  On January 23, 2024, the Gladwin County Board of Commissioners approved a resolution conferring venue for this appeal on the Midland County Circuit Court (**Exhibit A**).

## <u>Statement of Questions Presented</u>

Under Michigan law, a special assessment imposed in an amount not reasonably related to the increase in market value conferred on the assessed property amounts to a taking without due process of law. Under the Inland Lake Level Act, a special assessment must be approved by resolution before construction begins on an improvement.

On February 6, 2024, Appellees Midland and Gladwin Counties approved special assessment rolls for the Four Lakes Special Assessment Districts. The special assessments are designed to allow the Counties' delegated authority, Appellee Four Lakes Task Force, to complete a project to set normal lake levels for Wixom, Sanford, Smallwood, and Secord Lakes. The capital assessment seeks to raise $217 million from just over 8,000 parcels, and individual assessments range in the tens of thousands or even hundreds of thousands of dollars over 40 years. Before approving the special assessment rolls, Appellees failed to consider whether the assessments had any reasonable relationship to the benefits conferred on Appellants' properties in the form of increased market value. Instead, Appellees concocted an arbitrary assignment of alleged benefits that do not save the assessments from their constitutional infirmities. Readily available data reveals that the assessments are vastly disproportionate to the benefit conferred on the assessed properties.

**I.    Are Appellees' decisions approving the February 6, 2024 resolutions supported by competent, material, and substantial evidence on the whole record?**

Appellants answer:            No.
Appellees would answer:       Yes.

**II.   Do the special assessments take Appellants' properties without due process of law?**

Appellants answer:            Yes.
Appellees would answer:       No.

**Statement of Facts**

This appeal arises from the February 6, 2024 decisions of the Midland County Board of Commissioners and the Gladwin County Board of Commissioners approving the 5-year operation and maintenance special assessment rolls and the 40-year capital improvement special assessment rolls for the Four Lakes Special Assessment District, which are intended to fund a project (the "Project") to restore Wixom Lake, Sanford Lake, Smallwood Lake, and Secord Lake (collectively the "Four Lakes") following the failure of the Edenville Dam.

Appellant Heron Cove Association is a Michigan nonprofit corporation organized "[t]o promote the general welfare of its members, owners of any property along or near Secord, Smallwood, Wixom, and Sanford Lakes, including backlot properties with dedicated access ('Four Lakes'), or any property in or touching the Four Lakes Special Assessment District in or around Gladwin and Midland Counties, Michigan."  It is comprised of property owners and those with property interests within the Four Lakes Special Assessment District.  Individual appellants are members of the Heron Cove Association who own or have interest in property within the Four Lakes Special Assessment District.

The Appellee Counties originally filed petitions through their delegated authority, Appellee Four Lakes Task Forces (FLTF), to establish normal lake levels for the Four Lakes and confirm the boundaries of the Four Lakes Special Assessment District (the "District") in 2019.  These proceedings, brought under Part 307 of the Natural Resources and Environmental Protection Act, Act 451 of 1994, as amended, MCL 307.30701 *et seq.*, in both Midland and Gladwin Counties, were assigned to Chief Judge Stephen P. Carras (in Gladwin County by order of the State Court Administrative Office).  Chief Judge Carras eventually approved the petitions and confirmed the boundaries of the District.  (Tab #2, Order Setting Normal Lake Levels for Sanford Lake, Wixom

6

Lake, Smallwood Lake and Secord Lake and Confirming the Four Lakes Special Assessment District Boundaries, 1-4.)

FLTF then "proceeded to design, obtain necessary permits and construct the Lake Level Project which, due to the complexity and state dam safety requirements, was to be completed in phases over multiple years." In the revised capital assessment memo, Appellees note that they raised at least $220 million in grants for the Project from the State of Michigan and federal and private sources, $200 million of which was intended to be used for restoration construction (Tab #37, FLTF 1/4/2024 Capital Assessment Memo, 10-11). But FLTF spent $20 million of that money for interim restoration and recovery efforts, so it has $180 million in State of Michigan dollars remaining for restoration construction. *Id.* The memo states that, in 2021, FLTF released a planning estimate of $250 million. *Id.* So, the cost to be passed on to the SAD, in 2021, was $70 million. But then the cost of the Project ballooned. Now the total cost of the project is $399,700,000. *Id.* The cost to the SAD, therefore, increased to approximately $217 million.

Construction of the Dams began sometime in 2022. On its website, FLTF has posted summaries and photos of the progress of construction at the Secord and Smallwood Dams in the "16 months" prior to February 2024.[1] On January 4, 2024, FLTF President David Kepler signed a memorandum to the FLTF Board stating that "design engineering and permitting are complete" and that the Secord, Smallwood, and Sanford "dams are under construction." "Edenville" had "begun construction on pull-ahead projects." According to the January 4, 2024 memorandum, the "Capital Assessment amount is based on the total restoration project cost less the grants that have been received." (Capital Assessment Memo, 3.) "The computation of cost is based off bid projects

---

[1] Four Lakes Task Force, February 14, 2024, "State of Construction on Northern Dams," https://www.four-lakes-taskforce-mi.com/updates/photos-show-progress-on-secord-and-smallwood.

at Secord, Smallwood, and Sanford. The Edenville estimate is now based on 100% design and has been updated to reflect the pricing received for the other three projects." *Id*.

On January 15, 2024, FLTF held a required public hearing regarding the capital special assessment roll and the 2025-2029 operations and maintenance special assessment roll (Tab #18 Minutes, 1-3; Tab #19 Hearing Transcript).

Following that public hearing, FLTF released a revised methodology for determining the apportionment of the special assessments. The methodology states that FLTF endeavored to create a "fair" distribution of the assessments. It notes that although it is permitted to assess the relevant townships, villages, cities, and counties at-large, it determined not to assess those entities at-large on the capital assessment. Instead, the remaining $217 million needed to construct the Project as planned would be assessed only on private property owners in the SAD. (Tab #12, Four Lakes Special Assessment District Assessment Methodology- Revised January 2024, 1.)

On February 6, 2024, the Counties approved the capital and operations and maintenance special assessment rolls (Tab #32 Midland County 2/6/2024 Resolution Approving Special Assessment Rolls; Tab #33 Gladwin County 2/6/2024 Resolution Approving Special Assessment Rolls). The Counties also approved the financing plan, which provides that an aggregate principal not to exceed $217,700,000 may be secured by and payable from the collection of the special assessments (Tab #30 Midland County 2/6/2024 Resolution Approving Financing Plan; Tab #31 Gladwin County 2/6/2024 Resolution Approving Financing Plan).

On February 20, 2024, Appellants claimed an appeal of the Counties' decisions. Appellants filed an amended claim of appeal on February 21, 2024. Following a hearing on March 21, 2024, Chief Judge Carras recused himself, and this appeal was assigned to Judge Beale.

## Standard of Review

"An administrative agency decision is reviewed by the circuit court to determine whether the decision was authorized by law and supported by competent, material, and substantial evidence on the whole record."   Const. 1963, art. 6, § 28.   "Substantial evidence is any evidence that reasonable minds would accept as adequate to support the decision; it is more than a mere scintilla of evidence but may be less than a preponderance of the evidence."  *Barak v Drain Com'r for Oakland Co*., 246 Mich App 591, 597; 633 NW2d 489 (2001) (cleaned up).

## Argument

### I.     Appellants' decisions were not supported by competent, material, and substantial evidence on the whole record.

Appellees' February 6, 2024 decisions to approve the special assessment rolls are not supported by competent, material, and substantial evidence on the whole record.  Specifically, the record contains no evidence of the benefits likely derived from the Project or the proportionality of the assessments, as required by law. Instead, FLTF was focused on a "fair" distribution, not on derived benefits, but under either the applied methodology resulted in unlawful disproportionality.

#### A. To be valid, special assessments must lead to an increase in market value that is proportional to the assessment.

Under the Inland Lake Level Act ("ILLA)," otherwise known as Part 307, the cost of maintaining legal lake levels may be offset by special assessments.   MCL 324.30704(1). Following approval of the petition to set a normal lake level, the circuit court that approved the petition is required to confirm the boundaries of a special assessment district.  MCL 324.30707(5). Properties that may be assessed are "privately owned parcels of land, political subdivisions of the state, and state owned lands under the jurisdiction and control of the department."   MCL 324.30711(1).

9

Special assessments are "presumed valid" and generally must be upheld unless "there is a substantial or unreasonable disproportionality between the amount assessed and the value which accrues to the land as a result of the improvements." *Dixon Road Group v City of Novi*¸ 426 Mich 390, 403; 395 NW2d 211 (1986). In particular, a special assessment will be found valid when two requirements are met: "(1) the improvement subject to the special assessment must confer a benefit on the assessed property and not just the community as a whole and (2) the amount of the special assessment must be reasonably proportionate to the benefit derived from the improvement." *Michigan's Adventure, Inc v Dalton Twp*, 290 Mich App 328, 335; 802 NW2d 353 (2010), *citing Kadzban v City of Grandville*, 442 Mich 495; 502 NW2d 299 (1993). However, when there is not a reasonable relationship between the amount of the assessment and the benefit conferred to the assessed property, it is "akin to a taking without due process of law." *Dixon*, 426 Mich at 403.

When determining whether an improvement confers a proportionate benefit on the specially assessed property, Michigan courts compare the market value of the property *with* the improvement to the market value of the assessed value *without* the improvement. *Michigan's Adventure, Inc*, 290 Mich App at 335. The Court of Appeals has explained the analysis as follows:

> [I]n order to determine whether the market value of an assessed property has been increased *as a result of* an improvement, the relevant comparison is not between the market value of the assessed property *after* the improvement and the market value of the assessed property *before* the improvement, but rather it is between the market value of the assessed property *with* the improvement and the market value of the assessed property *without* the improvement. The former comparison measures the effect of time, while the latter measures the effect of the improvement.

*Ahearn v Bloomfield Charter Twp*, 235 Mich App 486, 496-97; 597 NW2d 858 (1999) (emphasis in original). In other words, a special assessment can be found invalid if the public improvement does not increase the benefit of the assessed parcel in an amount roughly proportionate to the amount of the assessment.

Courts will intervene where there is an unreasonable proportionality between a special assessment and benefit conferred. *Dixon*, 426 Mich at 399. Courts look to a ratio comparing the amount of the assessment to the value conferred on the property to determine the proportionality of a challenged special assessment. *Id*.

B. <u>Appellees' methodology is devoid of any consideration of proportionality and benefit conferred to Appellants' properties as opposed to the community as a whole.</u>

Appellees' special assessment methodology is not supported by competent, material, and substantial evidence on the whole record. Nor is it authorized by law. The record before the Court demonstrates that the Counties and FLTF did not consider the proportionality of the benefit conferred on the specially assessed properties. The record also demonstrates that Appellees did not consider the amount of benefit conferred on the community as a whole by the Project. Instead, the record demonstrates that Appellees had a target revenue number, raised the funds they thought they could, and then apportioned the remainder on the properties within the SAD, without regard to any actual benefit conferred on the assessed parcels.

Although Appellees developed a methodology that ostensibly aimed to proportion the special assessment amongst the assessed properties on the basis of benefit derived, the methodology merely categorized the assessed properties in comparison with each other, and then each property was assessed a portion of the costs of the Project, without regard to the proportionality of the assessment to the actual benefit derived to that property. As Appellants demonstrate below, the record lacks material evidence and leaves many questions unanswered. On the basis of the record before the Court, the Court should hold that Appellees' decisions were not based on competent, material, and substantial evidence on the whole record. In the alternative, the Court should follow the invitation of *In re Project Cost and Special Assessment Roll for Chappel Dam*, 282 Mich App 142, 150; 762 NW2d 192 (2009), and invite the parties, in light of

the immense interests at stake in this appeal (including the ability of Appellants to keep their homes), to submit further evidence concerning the proportionality of the assessments to the derived benefit.  See also *Kadzban*, 442 Mich at 511-512 (Riley, J., concurring).

C.  <u>By Appellees' own words, the Four Lakes have a tremendous regional impact.</u>

According to its January 2024 methodology statement, "[t]he SAD contains 8,170 parcels, with 6,278 parcels having direct waterfront access and 1,892 parcels having deeded private access to the waterfront (backlots). . . .  The counties determined that all costs associated with the maintenance of the legal lake levels for the Four Lakes should be financed by special assessments to the properties within the SAD."  (Methodology- Revised January 2024, 1.)  In other words, Appellees' determined that the capital assessment would entirely fall on private property owners. No political subdivisions (counties, townships, villages, or cities) or state-owned properties were assessed on the capital assessment roll.  No reason was given.  But according to FLTF, the Four Lakes are vital to the local and regional economies.

- "The economic impact of the lakes reaches far beyond the shorelines to impact greater Midland and Gladwin counties, Saginaw County and further downstream in the Saginaw Bay watershed."

- "The Gladwin County population increased by nearly 40,000 people during the summer months making these lakes a large economic driver."

- "Local restaurants, marinas, hotels, shopping centers and other businesses depend on the strong economy that has existed in this region for decades because of the thriving lakes."

- "These lakes bring thousands of people to their waters every year for recreation and are some of the best fisheries in the state."[2]

In other words, in their own public statements, Appellees' claim that the Four Lakes, and therefore the Project, provide immense benefit to the entire region.  As economic engines, the Four

---

[2] Four Lakes Task Force, "Why Donate," <https://www.four-lakes-taskforce-mi.com/why-donate.html> (accessed March 12, 2024).

Lakes affect more than just the properties with waterfront or deeded private access.  Instead, the Four Lakes provides a significant number of jobs to the region, presumably to community members who do not own parcels with private access to the water and who remain untouched by any special assessment.  These businesses and visitors contribute to municipal general funds through their taxes.  But even though the Four Lakes, and therefore the Project, greatly benefit these properties and municipalities, they are not assessed.  Instead, the total unfunded cost of the Project is arbitrarily put on the backs of Appellants.  In other words, FLTF completely ignored the enormous public benefit which results in grossly disproportionate assessments to Appellants. Special assessments are only valid if the improvement confers a reasonably proportional benefit to assessed properties.  *Michigan's Adventure,* 290 Mich App at 335. The record contains no evidence that Appellees conducted any evaluation of the proportion of the overall benefit conferred to the region to that of Appellants' properties within the SAD.  Instead, they simply made a political decision to only assess Appellants' properties, without an explanation that can be found in the record before the Court.

      D.  <u>Appellees apportioned the assessment without regard to proportionality.</u>

The SAD methodology itself demonstrates its arbitrary nature and disregard to the proportionality required by *Dixon*.  As discussed, the parcels in the SAD were assigned a "derived benefit factor," which was used to suggest the amount of benefit derived to each parcel *compared to other parcels in the district*.  The derived benefit factor was calculated using a number of individual factors.  One of those factors is the "frontage factor. . . .  The frontage factor is a weighted factor given solely to parcels with direct access to the water."  (Four Lakes Special Assessment District Assessment Methodology- Revised January 2024, 5-6.)  But the methodology only weighs a properties' frontage as a benefit factor as compared to other parcels in the district.

As Appellees state in their methodology conclusion, "FLTF has worked to create a *fair* apportionment methodology that considers various benefits parcels receive" (Four Lakes Special Assessment District Assessment Methodology- Revised January 2024, 10 (emphasis added)).  The methodology summary contains no mention of proportionality or the actual increase in market value conferred by the Project to any property, as required by *Dixon*.  Instead, the methodology sought only to spread the unfunded cost of the Project amongst properties in the limited SAD on a comparative basis and not a derived benefit basis (i.e. "fairness" amongst the properties in the SAD).

The methodology also treats property owners who live upstream of all four dams the same as property owners who live downstream of all four dams.  The methodology does not account for differences in location.  The methodology does not account for the fact that the cost of each individual dam is different, that differing numbers of parcels lie around each of the former lakes, or that a property owner north of the northernmost dam does not likely benefit at all from reconstruction of the southernmost dam.  The Secord Dam is roughly 15 miles, as the crow flies, from the Edenville Dam.  Yet Appellees assume that parcels at both ends of the SAD are benefitted equally by, and equally responsible for, the entire four dam Project.  Further, the methodology does not account for differences in the quality of "frontage."  The frontage factor is calculated in the same way whether the parcel is located on one of the former lakes or whether it is located on the Molasses River, a tributary of the Tittabawassee River in the far northwest corner of the SAD, which is not deep enough to accommodate a boat in some places.  The record contains no evidence that these seemingly less benefited parcels, which have assessments equal to their downstream counterparts, will see a proportional increase in market value.

According to FLTF, state, federal, and private funding accounts for 55% of the overall costs of the Project.  Even if such considerations were relevant under *Dixon*, the record contains no evidence that the properties in the SAD receive even 45% of the benefit conferred by the Project. Again, the available record suggests that Appellees raised what they could and then assessed the remainder of the costs of the Project to the arbitrarily-drawn SAD.  Indeed, the cost of the Project to Appellants increased more than three times after the boundaries of the SAD were confirmed.  But the record contains no indication of how, or if, Appellees decided that the benefit conferred by the Project would be proportional to the increased assessments after the increases. Appellees' decisions were not supported by competent, material, and substantial evidence on the whole record.

In short, Appellees attempt to dress up their methodology in the language of the law by allocating the special assessments based upon invented terms like "derived benefit factors."  But they fundamentally misunderstand the purpose of the derived-benefit rule.  Under Appellees' interpretation of the derived-benefit principle, they could have assessed any amount of dollars needed to complete the Project, no matter the cost of individual assessments or the lake of increase in market value conferred to the properties.  Taken to its extreme, the logic of Appellees' methodology would allow them to assess just 10 properties to finance a $100 million project, as long as the underlying methodology had some level of "fairness" amongst those 10 properties. Pursuant to their own methodology, Appellees would have no misgivings that one property could be assessed $50 million but only see an increase in market value of $25,000 because the "fairness" methodology only compares properties in the district with others in the district without regard to the constitutional limitation of proportionality and derived benefit.

Appellants again note that there is no data in the record before the Court—even though some such data is available in this circumstance—about the proportionality of the benefits derived to Appellants' properties from the Project.  However, in this instance Appellants have the benefit of knowing the value of their property with a lake and without a lake.

Available tax records show fluctuations in property values from when the Four Lakes were present and after they retreated.  The below chart details changes in the state equalized value of a sampling of Appellants' parcels over time, illustrating property values with the improvement (before the Four Lakes retreated), without the improvement (immediately after the Four Lakes retreated), and today.  The right-hand column indicates the total principal capital assessment for that parcel.  The data included below can be found in **Exhibit B**.

| Parcel | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | C.A. |
|---|---|---|---|---|---|---|---|
| 110-230-000-006-00 | 8,400 | 7,500 | 9,300 | 9,300 | 11,300 | 11,300 | 22,065.95 |
| 110-230-000-015-000 | 17,000 | 17,300 | 17,800 | 18,300 | 19,700 | 19,700 | 22,065.95 |
| 030-175-000-021-41 | | 29,400 | 28,500 | 36,400 | | | 6,606.57 |
| 030-175-000-014-00 | | 45,000 | 37,500 | 44,100 | | | 22,065.95 |
| 150-200-000-053-00 | 85,600 | | | | 84,800 | 106,700 | 39,159.01 |
| 150-200-000-060-00 | | 68,000 | 54,100 | 61,700 | | | 28,969.82 |
| 130-124-000-137-00 | 71,200 | 84,200 | 90,800 | 96,200 | 103,200 | 111,300 | 38,009.82 |
| 070-120-000-059-00 | | | 76,100 | 75,800 | 83,700 | | 27,549.41 |

| 130-160-000-008-00 | 59,400 | 63,600 | 59,700 | 58,900 | 60,000 | 88,800 | $33,431.46 |
| 110-377-000-385-00 | 44,500 | 47,800 | 48,200 | 49,300 | 51,600 | 63,700 | $26,875.54 |
| 130-126-000-245-00 | | 42,000 | 51,300 | 52,700 | 61,100 | 58,700 | $25,656.63 |
| 26-030-170-000-014-00 | | | | | 4,200 | 5,400 | $31,711.55 |

As the Court can see, the first assessment listed, for Parcel No. 110-230-000-006-00, is *double* the state equalized value of the property.  That parcel, owned by Robert and Karen Price, is near the Molasses River, a tributary of the Tittabawassee River, northwest (and upstream) of the Project.  The water near the Prices' property is not deep enough (when it exists at all) to hold a boat.  It is not "lakefront" property.  Yet Appellees' methodology assumes that the parcel will see a dramatic increase in value of that parcel.  And Parcel No. 030-170-000-014-00, owned by Gregory and Tamara Schowalter has a 2024 state equalized value of $5,400.  Yet the parcel's principal capital assessment is $31,711.55

As the above data demonstrates, the loss of the Four Lakes does not appear to have substantially decreased property values within the SAD.  The data also shows that the values of many properties has increased substantially in the last few years *without* the Project.  These examples demonstrate that any derived benefit from the Project will be marginal at best, and that the Court may require additional information in order to fully analyze the proportionality of the special assessments.  The special assessments against many properties will be far greater than 2.6 times the increased market value realized with the Project.  Appellees considered no record evidence to the contrary.  The special assessments are invalid under *Dixon*.

## II.      The special assessments are a taking without due process of law.

Appellees' actions amount to a taking and violate Appellants' procedural due process rights, and additional procedural protections are necessary to mitigate against the risk of an erroneous deprivation of Appellants' most sacred constitutional rights.

As discussed above, the record before the Court demonstrates that the Counties and FLTF did not consider the proportionality of the benefit conferred on the specially assessed properties. Instead, the record demonstrates that Appellees had a target revenue number, raised the funds they thought they could, and then apportioned the remainder on the properties within the SAD without regard to actual benefit.  Although Appellees developed an unlawful methodology cloaked in legalese to proportion the special assessment amongst the assessed properties on the basis of derived benefit, the methodology merely categorized the assessed properties in comparison with each other and treated properties the same regardless of where they are located in the SAD.  Each property was then assessed a portion of the costs of the Project without regard to the proportionality of the assessment to the actual benefit derived to that property in the form of increased market value.  The record contains no evidence that Appellees conducted any evaluation of the proportion of the overall benefit conferred to the region to that of Appellants' properties within the SAD.  A disproportionate assessment is a taking without due process of law.  *Dixon*, 426 Mich at 403.

The amount of process due to a litigant is a flexible concept, dependent on the circumstances of the case.  *Chappel Dam*, 282 Mich App at 150.  To determine whether a governmental actor has violated a person's rights to procedural due process, Michigan courts employ the three-part test from *Matthews v Elridge*, 424 US 319, 335; 96 S Ct 893; 47 L Ed 2d 18 (1976):

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or

substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

Appellees will presumably argue (as they did in their motion to expedite) that this Court should follow the procedures used in *Chappel Dam* and rule on this appeal on briefs and oral argument (see Appellees' March 11, 2024 Brief in Support of Motion to Expedite, 6). In *Chappel Dam*, the Court of Appeals noted that property owners were afforded notice and a public hearing before the confirmation of the roll. *Chappel Dam*, 282 Mich App at 151. Appellants do not dispute that, in ordinary circumstances, the procedures set forth in the ILLA, and the procedures approved of in *Chappel Dam*, may be sufficient to comply with *Matthews* and constitutional standards. But for several reasons, that is not true here.

In *Chappel Dam*, the Gladwin County Drain Commissioner determined that the Chappel Dam required substantial repair, in the amount of $2.04 million, and that the costs to repair the dam would be divided between the property owners in the special assessment district, the county, and the township. *Id.* at 144. After determining the apportionment, pursuant to the Inland Lake Level Act, "Part 307," the drain commissioner held a public hearing in which many of the property owners protested the apportionment. *Id.* The next day, the Gladwin County Bord of Commissioners approved the special assessment roll, and ten days later, an appeal of the special assessment roll was filed in the Gladwin County Circuit Court. *Id.* In an expedited fashion, solely on briefs and in in short order, the circuit court affirmed. *Id.* at 151.

At the Court of Appeals, the central issue was the interplay of Part 307 and the Drain Code. Reviewing the circuit court's procedures, the Court of Appeals held "that the Legislature specifically provided for circuit review and knowingly excluded from the ILLA the Drain Code's

procedure for review" and that "the Legislature has provided different review procedures for drains and dams." *Id.* at 147-148.  The Court of Appeals explained that:

> Petitioners maintain that the ILLA states that the Drain Code appeal procedures must be used. However, the ILLA imposes no such requirement. Instead, the ILLA provides for the use of Drain Code procedures to be followed as close as possible in the "proceedings for levying special assessments and issuing special assessment bonds...." MCL 324.30705(1). Rather than repeat the procedures for levying special assessments, the Legislature refers those who use the ILLA for lake levels to the Drain Code for details of how to issue a special assessment, regardless of the purpose. Similarly, the Legislature provided for a notice of hearing in the ILLA and then referred users to tax provisions to detail the exact process of providing notice. MCL 324.30714(2)(b). The ILLA makes no such reference to the Drain Code concerning the review process. We therefore agree with the circuit court that a harmonious reading of the ILLA and the Drain Code is that the ILLA refers to the Drain Code for the procedures to levy special assessments and issue special assessment bonds, but provides different appeal procedures for the establishment of dams and the establishment and maintenance of lake levels.

*Id.* at 149.  In short, the Court of Appeals held that the circuit court appropriately followed the procedures outlined in the court rules for administrative appeals in contested cases.  *Id.* at 146.

Appellants respectfully submit that this case requires a more detailed process.  The notice and public hearings provided to Appellants under the ILLA are not constitutionally sufficient as applied here.  The intent of the required notices and public hearings under the ILLA is to protect the interests of the public against arbitrary government action and to ensure that the governmental actor has considered the varying public interests.  *Id.* at 150.  The ILLA imposes an additional procedural safeguard: it requires counties to approve costs and special assessment rolls by resolution *before construction begins*.  MCL 324.30714(3).  And under the ILLA, a special

assessment roll is final and conclusive unless appealed within 15 days of the approval of the roll by the county or counties.

Here, construction began before the time to appeal the special assessments was final. Indeed, Appellees have represented to the public that this appeal means that construction must halt and that the final phases of construction will be delayed.  In their motion to expedite, Appellees claimed that construction bids for the Edenville Dam were submitted in January 2024 and are valid for 60 days (Appellees' Brief in Support of Motion to Expedite, 8).  These additional facts, not present in *Chappel Dam*, suggest that the public hearings held pursuant to the ILLA were mere formalities.  The January 15th hearing afforded no meaningful opportunity to be heard; Appellees at that hearing did not consider the varying public interests.  In other words, the January 15 public hearing was held *after* construction had already begun, *after* Appellees had committed themselves to a specific funding plan, and *after* Appellees had received construction bids for the final phase of construction.

The ILLA's requirement that costs and special assessments rolls be approved before construction is begun is vital to the structure of the ILLA and the procedural due-process rights of would be appellants.  The ILLA guarantees the right to an appeal from a special assessment.  MCL 324.30714(4).  The appeal must be claimed within 15 days of approval of the special assessment rolls.  *Id*.  For an appeal under the ILLA to have any potential remedy, construction, cannot begin until the rolls are final.  Under Michigan law, governmental defendants successfully rely on laches as a defense to court actions that seek to claw back allegedly improper bond sales when the action is commenced.  See *Bigger v Pontiac*, 390 Mich 1; 210 NW2d 1 (1973); see also *Sessa v Macomb Co*, 220 Mich App 279; 559 NW2d 70 (1996).  The logic of *Bigger* and *Sessa* rests on the premise that, once bonds are sold, courts cannot fashion a remedy to litigants challenging the governmental

body's process leading up to the sale of the bonds because bondholders, once they purchase bonds without notice of court challenges, have vested interests that could be defeated by any subsequent litigation.  *Sessa*, 220 Mich App at 287.  Along these lines, the ILLA seeks to prevent counties from giving third-parties any vested interests in an improvement before any necessary special assessment rolls are approved and the time period to appeal has run.

Furthermore, the process afforded to Appellants under Part 307 did not allow Appellants sufficient time to obtain further evidence of proportionality so that they could challenge their assessments.  The Notice of Public Hearing for the January 15, 2024 public hearing was posted in the physical offices of Midland County, Gladwin County, and FLTF on December 22, 2023.  It was posted on the websites of Midland County and FLTF on December 22, 2023, and on the website of Gladwin County on January 5, 2024.  (Tab #14, Stryker Affidavit of Posting, 2.)  This short period between the time of posting and the hearing, during the holiday season, was never enough time for Appellants to collect evidence and obtain appraisals of their property in order to protest the proportionality of their assessments.

The private interest at stake here is Appellants' ability to remain in their homes.  In *Chappel Dam*, the special assessment sought to raise only about $2 million.  Here, the capital assessment seeks to raise approximately $217 million.  And as the table above shows, individual assessments run into the tens of thousands, and even hundreds of thousands, of dollars for individual parcels.  As *Dixon* explained, an assessment lacking a reasonable relationship to derived benefit is akin to a taking without due process of law.

Under Michigan law, "Private property shall not be taken for public use without just compensation therefore being first made or secured in a manner prescribed be law."  Const. 1963, art 10, §2.  "If private property consisting of an individual's principal residence is taken for public

22

use, the amount of compensation made and determined for that taking shall be not less than 125%

of that property's fair market value, in addition to any other reimbursement allowed by law." *Id.*

An "inverse condemnation" occurs when a governmental actor takes a property in fact, even

though the governmental actor does not comply with the required statutory eminent-domain

process. *Mays v Snyder*, 323 Mich 79; 916 NW2d 227 (2018). "A plaintiff alleging a de facto

taking or inverse condemnation must establish (1) that the government's actions were a substantial

cause of the decline of the property's value and (2) that the government abused its powers in

affirmative actions directly aimed at the property." *Id*. at 80.

Here, Appellees took action against Appellants' properties that are the substantial cause of

a likely decline in property values when they approved the special assessment rolls. As shown

above, some assessments are nearly equal to or even more than the state equalized value of

Appellants' properties. Many Appellants live on fixed incomes. They simply cannot afford such

assessments. If they seek to sell, they will not recover the value of their homes from buyers.[3] And

without an ability to pay, their homes will be subject to tax foreclosure, and absolute title will vest

in foreclosing *governmental* units. See MCL 211.78a-m. In other words, Appellees will have

achieved the taking of private property without just compensation and without complying with the

statutory eminent domain process.

Additional process during this appeal is only a financial and administrative burden on

Appellees' because of their own chosen timeline and own decisions. Appellants' chose to receive

construction bids for Edenville prior to the expiration of the timeline to appeal, and they chose to

construct the other three dams before financing was secured. No matter the scale of the emergency

---

[3] When a property subject to a special assessment is purchased and financed, the assessment is typically paid in full as part of the sale. If a property is worth $100 thousand before the Project, but only sees a $10 thousand increase in value from a $30 thousand special assessment, the buyer is not likely to pay $130,000 for the property. The seller will then, in effect, suffer a diminished value of their property caused by Appellees' actions.

that might have been, Appellees cannot disregard Appellants' constitutional rights to their properties because Appellees' chose specific timelines and courses of action. Further still, Appellees' also cannot reasonably argue that they did not plan for or anticipate an appeal of the special assessment—FLTF's own computation of cost included a $100,000 estimated cost to handle appeals (January 4, 2024, Kepler Memo, 4.). And the right to an appeal is embedded in Part 307 itself.

In other special assessment contexts, appellants are afforded the right to present evidence regarding proportionality and benefit derived. Before the Tax Tribunal, property owners and governmental units are permitted to present evidence. Mich Admin Code, R 792.10201 *et seq*. Under the Drain Code, a Board of Review is convened. MCL 280.155-59. Under *Chappel Dam*'s guidance that the process due in any given factual circumstance is flexible, this Court should afford Appellants' additional process to sustain their claims on appeal.

## Conclusion

For the reasons stated above, Appellants request that this Court vacate the special assessment rolls, order a reapportionment of the special assessment roll so that the assessments are proportional to the increase in market value derived from the Project, or order additional discovery related to the same, and any other relief the Court finds just and equitable.

Respectfully Submitted,

FOSTER, SWIFT, COLLINS & SMITH, P.C.

Dated: March 26, 2024             By: _____

Michael D. Homier (P60318)
Laura J. Genovich (P72278)
Keith T. Brown (P84193)
FOSTER, SWIFT, COLLINS & SMITH, PC
*Attorneys for Appellant*
1700 E. Beltline Ave. NE, Suite 200
Grand Rapids, MI 49525
(616) 726-2200
mhomier@fosterswift.com
lgenovich@fosterswift.com
kbrown@fosterswift.com

## **WORD COUNT CERTIFICATION**

This brief contains 6,644 words, in compliance with MCR 7.212 (B).

FOSTER, SWIFT, COLLINS & SMITH, PC
*Attorneys for Appellant, Tuscola*
*Area Airport Zoning Board of Appeals*

Dated: March 26, 2024             By:   */s/ Michael D. Homier*

Michael D. Homier (P60318)
Laura J. Genovich (P72278)
Keith T. Brown (P84193)
1700 E. Beltline Avenue NE, Suite 200
Grand Rapids, MI 49525
(616) 726-2230

89232:00001:200402611-5

25