# EXHIBIT I

# STATE OF MICHIGAN
## IN THE CIRCUIT COURT FOR THE COUNTY OF MIDLAND

HERON COVE ASSOCIATION, et al,

      Appellants,

v.

MIDLAND COUNTY BOARD OF
COMMISSIONERS, and GLADWIN
COUNTY BOARD OF COMMISSIONERS,
and FOUR LAKES TASK FORCE,

      Appellees.

_____/

Case No. 24-2751-AA

Hon. Michael J. Beale

| | |
|---|---|
| Michael D. Homier (P60318) | Joseph W. Colaianne (P47404) |
| Keith T. Brown (84193) | Zachary C. Larsen (P72189) |
| FOSTER, SWIFT, COLLINS & SMITH, PC | Lauren K. Burton (P76471) |
| *Attorneys for Appellants* | CLARK HILL PLC |
| 1700 E. Beltline Ave. NE, Suite 200 | *Attorneys for Appellees* |
| Grand Rapids, MI 49525 | 215 S. Washington Square, Ste. 200 |
| (616) 726-2200 | Lansing, MI 48933 |
| mhomier@fosterswift.com | (517) 318-3100 |
| kbrown@fosterswift.com | jcolaianne@clarkhill.com |
| | zlarsen@clarkhill.com |
| | lburton@clarkhill.com |

## APPELLEES' BRIEF ON APPEAL

## ORAL ARGUMENT REQUESTED

# TABLE OF CONTENTS

Page

Table of Contents ............................................................................................................. i

Index of Authorities ....................................................................................................... iii

Statement of Jurisdiction .............................................................................................. viii

Counter-Statement of Questions Presented .................................................................... ix

Introduction ..................................................................................................................... 1

Counter-Statement of Facts ............................................................................................. 3

Argument ....................................................................................................................... 26

I.      Appellant HCA Lacks Standing To Bring The Claim of Appeal To Set Aside The Lake Level Assessment Rolls Approved By the Appellees ............................................. 26

        A.      Standard of Review – Standing to Sue. ............................................... 26

        B.      Appellant HCA Lacks Standing To Represent Members Listed In The Caption Of The Claim Of Appeal Where Such Members Claims Regarding The Lake Level Special Assessments Levied are Inherently Antagonistic, Separate and Unique and HCA's Representation is Akin to Advocating the Interests of the General Public. ....................................... 27

        C.      Appellant HCA Lacks Standing To Represent Members Listed In The Caption Of The Claim Of Appeal Where Such Members Either Do Not Own Property In The FLSAD Or Did Not Perfect The Right to Appeal By Failing to Object at The Hearing. ........................................................ 29

II.     The Delegated Authority and Board of Commissioners' Approval of the Lake Level Special Assessment Rolls Was Not Contrary to Law. ............................................. 32

        A.      Standard of Review: Appellants wrongly insert an inapplicable review standard, and—in any event—the Counties complied with applicable law. ........ 32

                1.      The "substantial evidence" test does not apply here because no formal evidentiary hearing was required. ................................... 33

                2.      This Court only reviews administrative decisions under the "substantial evidence" test where an evidentiary hearing is required by law. ................................................................................. 33

3.   Part 307 did not require nor did the Counties conduct a trial-like evidentiary proceeding. ............................................................. 35

4.   Lake Level Special Assessments Made by the Delegated Authority Is Afforded Great Deference. ...................................................... 36

5.   As With Drain Assessments Under the Michigan Drain Code, Lake Level Special Assessments Under Part 307 Are Not Related to Property Taxes, But Are Exactions Made Through the Counties' Police Power Exercised For the Benefit and Welfare of the Public. ........ 40

6.   The FLTF Exercised its Best Judgment in Preparing the Lake Level Special Assessment Rolls, Fairly Apportioning the Costs of the Restoration and Operation and Maintenance of the Four Dams to the Property Owners. ............................................................. 42

III.   Appellants received adequate due process through Part 307's statutorily prescribed notice and public hearing requirements. ......................................... 47

A.   The Appellees complied with all statutorily prescribed process, which meets the minimal constitutional standards of Due Process. ............................... 47

B.   Many of the Appellants who now complain of inadequate procedures did not even avail themselves of the opportunity to be heard through public comment or by submitting evidence to support their claims. ............................... 50

C.   *This Court has no authority to rewrite statutory procedures.* ............................. 51

D.   *The fact that construction of the project is underway, is not material to the case.* .................................................................................................. 51

Conclusion and Relief Requested ................................................................ 52

CLARKHILL\59824\483263\276989361.v1-4/16/24

# INDEX OF AUTHORITIES

<u>Page</u>

**Cases**

*Ashely Ann Arbor, LLC v Pittsfield Charter Twp*,
 299 Mich App 138; 829 NW2d 299 (2012) ............................................................................. 40

*Barclae v Zarb*,
 300 Mich App at 483; 834 NW2d 100 ............................................................................. 26, 27

*Bowie v Arder*,
 441 Mich 23; 490 NW2d 568 (1992) ..................................................................................... 26

*Boyd v Civil Serv Comm'n*,
 220 Mich App 226; 559 NW2d 342 (1996) ........................................................................... 33

*Brandon Sch Dist v Mich Ed Special Servs Ass'n*,
 191 Mich App 257; 477 NW2d 138 (1991) ........................................................................... 34

*Charter Twp Of Lansing v Ingham County Drain Commissioner*,
 unpublished *per curiam* opinion of the Court of Appeals, issued December 2, 2014
 (Docket Nos. 316870 and 318446) (2014 WL 6778948) ....................................................... 38

*Chicago, B & QR Co v Babcock*,
 204 US 585 (1907) .................................................................................................................. 38

*Clark v City of Royal Oak*,
 325 Mich 298; 38 NW2d 413 (1949) ..................................................................................... 37

*Crampton v Royal Oak*,
 362 Mich 503; 108 NW2d 16 (1961) ..................................................................................... 37

*Cummings v Garner*,
 213 Mich 408; 182 NW 9 (1921) ........................................................................................... 38

*Detroit Fire Fighters Ass'n. v. City of Detroit*,
 449 Mich 629; 537 NW2d 436 (1995) ................................................................................... 27

*Dixon Rd Group v Novi*,
 426 Mich 390; 395 NW2d 211 (1986) .............................................................................. 37, 41

*Drainage Board v Village of Homer*,
 351 Mich 73; 87 NW2d 72 (1957) ........................................................................................... 3

CLARKHILL\59824\483263\276989361.v1-4/16/24

*Federated Ins Co v Oakland Co Rd Comm,*
   475 Mich. 286; 715 NW2d 846 (2006)..................................................................... 26

*Goodrich v McMillan,*
   217 Mich 630; 187 NW 368 (1922)........................................................................ 3

*Henderson v Civ Serv Comm'n,*
   321 Mich App 25; 913 NW2d 665 (2017)............................................................... 34

*In re Beatrice Rottenberg Living Trust,*
   300 Mich App at 355; 833 NW2d 384 ................................................................... 27

*In re Eight and One-Half Mile Relief Drain,*
   369 Mich 641; 120 NW2d 789 (1963).................................................................... 37

*In re Eight and One-Half Mile Relief Drain,*
   369 Mich 654 (1963) ............................................................................................ 38

*In re Matter of Van Etten Lake,*
   149 Mich App 517; 386 NW2d 572 (1986).......................................................... 4, 6

*In re Project Cost and Special Assessment Roll For Chappel Dam,*
   282 Mich App 142; 762 NW2d 192 (2009)........................................... 8, 29, 32, 35

*In the Matter of: Wixom Lake, Sanford Lake, Smallwood Lake and Secord Lake,*
   Midland Circuit Court Case #19-5980-PZ.............................................................. 9

*Kadzban v City of Grandville,*
   442 Mich 495; 502 NW2d 299 (1993).................................................................... 37

*Kelser v Dep't of Treasury,*
   167 Mich App 18; 421 NW2d 558 (1988)............................................................... 30

*King v Butchbaker,*
   unpublished per curiam opinion of the Court of Appeals, issued August 9, 2005 (Docket No.
   254912).......................................................................................................... 37, 39

Kosmalski *ex rel. Kosmalski v St John's Lutheran Church,*
   261 Mich App 56; 680 NW2d 50 (2004)................................................................ 26

*Lansing Sch Ed Ass'n v Lansing Board of Educ,*
   487 Mich. at 355; 792 NW2d 686 .................................................................. 26, 27

*Manor House Apartments v City of Warren,*
   204 Mich App 603; 516 NW2d 530 (1994)............................................................. 30

*Michigan Employment Relations Comm'n v Detroit Symphony Orchestra, Inc.,*
   393 Mich 116; 223 NW2d 283 (1974)................................................................... 34

iv

*Mudel v Great Atl & Pac Tea Co*,
   462 Mich 691; 614 NW2d 607 (2000).......................................................................... 34

*Pontiac Police & Fire Retirees v. Pontiac No. 2*,
   309 Mich. App. 611; 873 NW2d 783 (2015).......................................................... 26, 27

*Reed v Reed*,
   265 Mich App 131; 693 NW2d 825, 843 (2005).......................................................... 47

*Ross v Blue Care Network of Mich*,
   480 Mich 153; 747 NW2d 828 (2008)................................................................... 32, 34

*Trout Unlimited, Muskegon–White River Chapter v City of White Cloud*,
   195 Mich App 343; 489 NW2d 188 (1992)................................................................. 27

*USL Improvement Assoc v Oceana County Drain Commissioner*,
   unpublished per curiam opinion of the Court of Appeals issued Mar 13, 2012 (Docket
   Nos 297157 & 298080)................................................................................... 8, 29

*Vanzandt v State Employees Ret Sys*,
   266 Mich App 579; 701 NW2d 214 (2005).................................................................. 33

*Wescott v Civ Serv Comm'n*,
   298 Mich App 158; 825 NW2d 674 (2012)................................................................. 35

*West v Gen. Motors Corp*,
   469 Mich 177; 665 NW2d 468 (2003)...................................................................... 26

## Statutes

1962 PA 162 ......................................................................................... 7, 23, 29, 35

1973 PA 186 ................................................................................................. 40

MCL 205.701 *et seq*..................................................................................... 40

MCL 205.731 ............................................................................................... 40

MCL 211.741 *et seq*................................................................................... 29, 35

MCL 211.741(1) .............................................................................................. 7

MCL 211.741(3) .............................................................................................. 7

MCL 211741(2) ............................................................................................... 7

MCL 24.271 *et seq*........................................................................................ 32

v

MCL 24.272(3) ........................................................................................................... 35

MCL 24.272(4) ........................................................................................................... 35

MCL 24.273 ................................................................................................................ 35

MCL 24.275 ................................................................................................................ 35

MCL 24.276 ................................................................................................................ 35

MCL 24.277 ................................................................................................................ 35

MCL 24.278(1) ........................................................................................................... 35

MCL 24.285 ................................................................................................................ 35

MCL 280.1 *et seq.* ...................................................................................................... 37

MCL 280.151 ......................................................................................................... 37, 39

MCL 280.152 .............................................................................................................. 39

MCL 280.262 .............................................................................................................. 37

MCL 324.30101 *et seq.* ............................................................................................... 12

MCL 324.30301 *et seq.* ............................................................................................... 12

MCL 324.30701(c) ........................................................................................................ 8

MCL 324.30701(e) ........................................................................................................ 5

MCL 324.30701(h) .............................................................................................. 4, 6, 40

MCL 324.30702 ............................................................................................................ 5

MCL 324.30702(3) ...................................................................................................... 36

MCL 324.30704 ............................................................................................................ 5

MCL 324.30705 ......................................................................................................... 5, 6

MCL 324.30705(1) ...................................................................................................... 37

MCL 324.30705(3) ...................................................................................................... 6, 39

MCL 324.30707 ............................................................................................................ 5

MCL 324.30707(5) ........................................................................................................ 5

vi

MCL 324.30708(1) ............................................................................... 36, 41

MCL 324.30708(2) ..................................................................................... 36

MCL 324.30711 ..................................................................................... 5, 6, 36

MCL 324.30711(1) ............................................................................... passim

MCL 324.30711(2) ....................................................................................... 7

MCL 324.30712 ......................................................................................... 5, 6

MCL 324.30714(2) ................................................................................... 7, 47

MCL 324.30714(3) ................................................................................... 8, 35

MCL 324.30714(4) ......................................................................................... 8

MCL 324.3101 *et seq* ................................................................................. 12

MCL 324.3150 *et seq* ................................................................................. 12

**Rules**

MCR 2.116(C)(10) ....................................................................................... 26

MCR 2.116(G)(5) ......................................................................................... 26

MCR 2.201(B) ..................................................................................... 1, 26, 27

**Constitutional Provisions**

Const 1963, art 6, § 28 ....................................................................... 33, 34, 50

US Const. amend. XIV ................................................................................. 47

CLARKHILL\59824\483263\276989361.v1-4/16/24

## <u>STATEMENT OF JURISDICTION</u>

Appellees Midland County Board of Commissioners, Gladwin County Board of Commissioners, and the Four Lakes Task Force ("Appellees") do not dispute Appellants Heron Cove Association's and the numerous individual appellants' ("Appellants") statement of jurisdiction, except to the extent that Appellants lack standing as outlined further below.

CLARKHILL\59824\483263\276989361.v1-4/16/24

## **<u>COUNTER-STATEMENT OF QUESTIONS PRESENTED</u>**

1. Do the Appellants (Heron Cove Association and the numerous individual appellants listed in its Claim of Appeal) lack standing where:

      a.     the claims asserted by such persons or entities listed in the caption are inherently antagonistic, separate, and unique;

      b.     some of the persons listed in the caption do not own property within the Four Lakes Special Assessment District, and

      c.     several of the persons listed in the caption failed to perfect their right to appeal the special assessment rolls by not objecting or submitting evidence to support a claim that the Four Lakes Task Force's special assessment was contrary to law or was arbitrary, capricious, or fraudulent?

    Appellants Answer:          No.

    Appellees Answer:          Yes.

2. Did the Delegated Authority comply with Michigan law by assessing costs necessary to restore Secord, Smallwood, Wixom, and Sanford Lakes (the "Four Lakes") and to administer, operate and maintain the normal levels of the Four Lakes, to property owners within the Four Lakes Special Assessment District where the lake level assessments were based on the benefits derived to best protect the public health, safety and welfare, preserve the natural resources of the state, and preserve and protect property values around the Four Lakes?

    Appellants Answer:          No.

    Appellees Answer:          Yes.

3. Did those specific property owners listed in the caption and with property located within the Four Lakes Special Assessment District receive due process when they were notified of the public hearing to discuss the special assessment roll, were given the opportunity to question the Delegated Authority regarding the apportionment methodology and factors affecting their specific property or property but did not present *any* evidence that the Delegated Authority and Counties' decision failed to comply with the law?

    Appellants Answer:          No.

    Appellees Answer:          Yes.

CLARKHILL\59824\483263\276989361.v1-4/16/24

## INTRODUCTION

This administrative appeal challenges and threatens to derail FLTF's longstanding efforts to rebuild the Four Lakes that have been a core feature of the Midland community for decades and prominently factor into the property values and recreational opportunities for every homeowner in the FLTF Special Assessment District. Specifically, Appellants Heron Cove Association ("HCA") and a group of individuals identified in the caption of the Claim of Appeal (collectively "Appellants") seek to set aside the lake level special assessment rolls prepared by the Appellee FLTF and approved by Appellees, Gladwin and Midland County Board of Commissioners (the "Counties"). The lake-level special assessment rolls were confirmed in accordance with the procedures set forth in Part 307 to cover the administrative, operation, maintenance, repair, replacement and improvement costs to four high hazard dams required to maintain the lake levels of the Four Lakes. Nonetheless, under a deferential standard, Appellants seek to rehash the *factual* basis for FLTF's comprehensive judgments in apportioning approximately 55% of the capital improvement costs needed to complete restoration of the Four Lakes to over 8,000 waterfront and backlot properties. Though property owners are entitled to challenge the lake level special assessment rolls, Appellants' challenge here wholly lacks merit.

*First*, HCA lacks standing. As an organization, it cannot represent multiple persons or entities where their claims are inherently adverse, separate, and unique. Indeed, MCR 2.201(B) provides that: "An action must be prosecuted in the name of the real party in interest . . . ." In this case, the special assessment rolls were compiled using an apportionment methodology, which calculates the percentage of the project costs and the derived benefit to each specific property based on the general characteristics of that property. The total apportionment must equal 100%. Consequently, decreases to the apportionment of one property or class of properties, requires an increase to other properties (and

by design, the special assessment) in the lake level special assessment district. In other words, each of the purported property owners listed in the caption on appeal (assuming they have property in the FLSAD and perfected their right to appeal by objecting at the special assessment hearing), has uniquely different claims in connection with the assessment to their property which makes them adverse to one another. HCA, as an organization, cannot advocate the interests of the persons listed in the caption on appeal where each of the purported members' interests are antagonistic to one another. Beyond HCA's lack of standing, numerous persons or entities in the HCA (or listed as individual Appellants) either do not have property in the Four Lakes Special Assessment District or never bothered to submit timely objections prior to or at the lake level special assessment hearing. Consequently, these persons or entities also lack standing to sue. And this Court should dismiss the claim of appeal as to those entities.

_Next_, contrary to Appellants' claims in their brief, Appellants received adequate due process through Part 307's statutorily prescribed notice and hearing, which met the minimal constitutional standards of due process. The Delegated Authority is given broad authority to make special assessments it determines are reasonable according to benefits homeowners derive from the Four Lakes. To prevail, Appellants must overcome the presumption that the lake level special assessments are valid and prove that the lake level special assessments are contrary to law or arbitrary and capricious. Appellants cannot satisfy this heavy burden. Appellants were provided an opportunity to discuss, submit information and object to the special assessment rolls at the public hearing, but never bothered to present _any_ evidence that the Delegated Authority and Counties' decision approving the special assessment rolls failed to comply with the law.

In short, FLTF acted reasonably. And Appellants have not shown otherwise. Accordingly, this Court should affirm, or—alternatively—dismiss the appeal for lack of standing.

CLARKHILL\59824\483263\276989361.v1-4/16/24

## COUNTER-STATEMENT OF FACTS

### A. The History of the Four Lakes

Secord, Smallwood, Wixom and Sanford Lakes ("Four Lakes") are located in Midland and Gladwin Counties (State of Michigan) and were originally created by the impoundment of the Tittabawassee and Tobacco rivers by four privately-owned hydroelectric dams. On May 19, 2020, the Edenville (Wixom Lake) dam and Sanford (Lake) dam failed, resulting in catastrophic flooding leaving many in Midland and Gladwin counties with damaged property, flooding debris and shoreline devastation. The historic flooding of Midland and Sanford was a tragedy reaped from the combination of record rainfall and the negligence of the private dam owner, Boyce Hydro, that went too long uncorrected by government officials.

Years prior to the Edenville Dam failure, lake property owners—through the Four Lakes Task Force ("FLTF") (and its predecessor the Sanford Lake Preservation Association)—raised concerns over Boyce Hydro's operations which threatened the very existence of the Four Lakes. In early 2018, a group of lakefront property owners learned that Boyce Hydro was not in compliance with the terms of its FERC[1] license in connection with the Edenville Dam, and FERC was threatening to revoke the license. The dam operator, Boyce Hydro Power, LLC (and other Boyce entities, collectively "Boyce Hydro") had complete control over dam operations and ownership of the dams, bottomlands and flowage rights. Michigan common law does not require a private dam owner to maintain the existence of a dam or the artificial level of a lake.[2] Concerned

---

[1] Federal Energy and Regulatory Commission ("FERC").

[2] *Goodrich v McMillan*, 217 Mich 630; 187 NW 368 (1922) (Ownership of a dam does not impose a duty on the dam owner to maintain the water at an artificial level created by operation of a dam); *see also*, *Drainage Board v Village of Homer*, 351 Mich 73; 87 NW2d 72 (1957) (Riparian landowners were continuously charged with notice that the pond is artificial and that its level may be lowered or returned to natural state at any time by the dam owner).

with the potential loss of Wixom Lake, and future loss of the other three lakes, the lake associations and property owners sought a public solution and began the process of transitioning the four hydroelectric dams from private ownership to public ownership.

The counties of Midland and Gladwin formed a citizen task force to explore the process of acquiring, financing and managing the dams and lake levels in accordance with Part 307 "Inland Lake Levels" of the Michigan Natural Resources and Environmental Protection Act ("Part 307"). The purpose of Part 307 is to provide for the control and maintenance of inland lake levels for the benefit and welfare of the public, that best serves to preserve the natural resources of the state, and *best preserves and protects the value of property around a lake*.[3] [emphasis added]. Part 307 authorizes counties to make policy decisions as to the levels of their inland lakes, and to build and finance dams as necessary to maintain the desired lake levels.[4] It authorizes the establishment of a special assessment district to defray the costs in connection with administration, operation, maintenance and improvement of lake level structures.[5] Moreover, the special assessment district is authorized to issue municipal bonds, notes and lake level orders in anticipation of special

---

[3] See MCL 324.30701(h), "Normal level" mean the level or levels of the water of an inland lake that provide the most benefit to the public; that best protect the public health, safety, and welfare; that best preserve the natural resources of the state; and that best preserve and protect the value of property around the lake..[.]".

[4] *In re Matter of Van Ettan Lake*, 149 Mich App 517, 525; 386 NW2d 572 (1986).

[5] MCL 324.30711(1): "The county board may determine by resolution that the whole or a part of the cost of a project to establish and maintain a normal level for an inland lake shall be defrayed by special assessments against the following that are benefited by the project: privately owned parcels of land, political subdivisions of the state, and state owned lands under the jurisdiction and control of the department. If the county board determines that a special assessment district is to be established, the delegated authority shall compute the cost of the project and prepare a special assessment roll."

assessments.[6] Part 307 provides the legal, operational and financial model for the public's sustainability of lake level structures.

**B. Part 307 "Inland Lake Levels" of the Michigan Natural Resources and Environmental Protection Act.**

This administrative appeal is based on the actions taken by the FLTF in its capacity as the delegated authority,[7] and the Counties pursuant to Part 307. Understanding the scope and purpose of Part 307 and processes will assist the Court with factual steps leading to the approval of the special assessment rolls, and this administrative appeal.

Part 307 authorizes a county board of commissioners to petition the local circuit court and request that it establish the appropriate (or normal) lake level for inland lakes located within the county.[8] Once the lake level(s) are established, Part 307 also grants the circuit court "continuing jurisdiction."[9] Realizing that there are costs associated with maintaining the court-ordered lake level, the legislature sensibly determined that the county can petition the circuit courts to establish a lake level special assessment district for the express purpose of allowing the county to defray the administration, design, construction, operation, maintenance, repair and improvement costs by distributing the costs to those in the judicially-established special assessment district.[10] Those who benefit from the lake, such as the private property owners adjacent (*i.e.*, waterfront) or with deeded access (*i.e.*, backlots), political subdivisions,

---

[6] MCL 324.30705.

[7] MCL 324.30701(e) "Delegated authority" means the county drain commissioner or any other person designated by the county board to perform duties required under this part [Part 307].

[8] MCL 324.30702, MCL 324.30707.

[9] MCL 324.30707(5)

[10] MCL 324.30704, MCL 324.30711, MCL 324.30712.

CLARKHILL\59824\483263\276989361.v1-4/16/24

and state owned lands, are typically included in the special assessment district and are subject to the lake level special assessments levied by the delegated authority.[11]

Part 307 provides for the control and maintenance of inland lake levels for the benefit and welfare of the public, to best serves to preserve the natural resources of the state, and to best preserve and protect the value of property around a lake.[12] Part 307 "authorizes counties to make policy decisions as to the levels of their inland lakes, and build and finance dams as necessary to maintain the desired lake levels."[13] To this end, the lake level special assessment district is authorized to issue municipal bonds, notes and lake level orders in anticipation of special assessments.[14]

To pay costs associated with a lake level project, Part 307 requires the "delegated authority" compute the costs of the lake level project(s), and prepare a lake level special assessment roll.[15] In levying the lake level special assessments, the delegated authority prepares a special assessment roll in accordance with the Michigan Drain Code.[16] The lake level special assessment roll is based on the delegated authority's apportionment of all costs required to maintain the court-ordered lake level, and if the revenues raised are insufficient to meet the computation costs as provided in Section 30712, the "special assessment district may reassessed without hearing using the same

---

[11] MCL 324.30711.

[12] See MCL 324.30701(h), "Normal level" mean the level or levels of the water of an inland lake that provide the most benefit to the public; that best protect the public health, safety, and welfare; that best preserve the natural resources of the state; and that best preserve and protect the value of property around the lake..[.]" See also *In re Van Ettan Lake*, 149 Mich App 517, 525; 386 NW2d 572 (1986) ("[T]he purpose of the Inland Lake Level Act is to provide for the control and maintenance of inland lake levels for the benefit of the welfare of the public.")

[13] *In re Van Ettan Lake,* 149 Mich App at 525–26.

[14] MCL 324.30705.

[15] MCL 324.30711(1); MCL 324.30712.

[16] MCL 324.30705(3) "[A]ll proceedings relating to the making, levying, and collection of special assessments authorized by this part … shall conform as nearly as possible to the proceedings for levying special assessments… as set forth in the drain code of 1956 . . . ."

6

apportioned percentage used for the original assessment."[17] Lake level special assessments, similar to drain assessments under the Michigan Drain Code, are based on the delegated authority's methodology that apportions the lake level project costs on the benefits derived to the properties, public corporations and state lands within the lake level special assessment district.[18]

Before submitting the special assessment roll to the county board of commissioners for final approval, there must be a public hearing to discuss the project costs and the special assessment roll.[19] The Part 307 lake-level special assessment hearing is akin to a "day of review" under the Michigan Drain Code, where property owners may have their apportionment reviewed and object to the special assessment. Part 307 requires that a mailing of the notice of hearing to each property owner in the special assessment district and the publication of the hearing notice twice in a newspaper that circulates in the special assessment district with the "first publication to be at least 10 days prior to the hearing."[20] The notice mailed to each property owner must comply with Michigan Public Act 162 of the Public Acts of 1962.[21] Public Act 162, among other things, provides that the hearing notice shall be mailed to the property owner of the property to be assessed (and whose name appears on the tax records) at least 10 days before the hearing and contain a statement that appearance and protest at the hearing is required in order to appeal the amount of the special assessment or may file an objection in writing, "in which case his or her personal appearance shall not be required."[22] Accordingly, before or at the hearing, property owners may

---

[17] MCL 324.30711(1) and (2).

[18] *Id.*

[19] MCL 324.30714(2).

[20] MCL 324.30714(2)

[21] *Id.*

[22] MCL 211.741(1), (2), & (3).

CLARKHILL\59824\483263\276989361.v1-4/16/24

review their lake level assessment, present evidence or other information that may affect the apportionment percentage, object to the special assessments and the costs of the project.

After the hearing, the costs of the lake level project and the lake level special assessment roll may be approved (or revised) by the delegated authority.[23] The final step in the process requires the costs of the project and the special assessment roll to be approved by the county board of commissioners.[24] A property owner subject to the assessment may then challenge the special assessment roll by appealing to the circuit court within fifteen days after approval by the county board.[25]

### C. Four Lakes Lake Level Proceedings; Four Lakes Special Assessment District

In 2018, and in accordance with Part 307, the Counties adopted resolutions finding that in "order to protect the public's health, safety and welfare, to best preserve the natural resources of the state, and to preserve and protect the value of property around the lakes" that it was necessary to establish the normal (legal) levels for all Four Lakes.[26] In addition, the resolutions provided that all costs in connection with the maintenance of the normal levels of the Four Lakes "shall be defrayed by special assessments for the benefits derived against privately owned parcels of land, political subdivisions of the state, and state owned lands."[27] The FLTF (formerly known as the

---

[23] MCL 324.30714(3).

[24] *Id.*

[25] MCL 324.30714(4); MCL 324.30701(c). Note: the Michigan tax tribunal lacks subject-matter jurisdiction to hear lake-level appeals. See *In re Project Cost and Special Assessment Roll For Chappel Dam*, 282 Mich App 142, 145 & 147; 762 NW2d 192 (2009); see also *USL Improvement Assoc v Oceana County Drain Commissioner*, unpublished per curiam opinion of the Court of Appeals issued Mar 13, 2012 (Docket Nos 297157 & 298080) (*Held*: Circuit court—not the Tax Tribunal—has jurisdiction to hear lake-level special assessment appeals).

[26] Record, Tab #1, Gladwin County Resolution  p 5; Midland County Resolution, p 12.

[27] *Id.*

8

Sanford Lake Preservation Association), was appointed as the Counties' Part 307 delegated authority, and to serve as the counties' agent to oversee the lake level project, to prepare a special assessment district(s) and special assessment roll(s), and to "take all other actions as necessary and required by the delegated authority as provided in Part 307."[28]

In 2019, the Counties filed a petition in the Midland circuit court to establish normal levels of the Four Lakes and confirm the boundaries of Four Lakes Special Assessment District ("FLSAD"). In support of their petition, the Counties submitted its memorandum in support which included a lake level study that comprehensively detailed information and facts that the Midland Circuit Court adopted in its determination of the normal levels for each of the Four Lakes and boundaries of the lake level special assessment district. This information can be found as a matter of record, *In the Matter of: Wixom Lake, Sanford Lake, Smallwood Lake and Secord Lake*, Midland Circuit Court Case #19-5980-PZ.

On May 28, 2019, following notice to all interested parties, receiving testimony and hearing, and after careful consideration Judge Carras entered the Lake Level Order confirming the FLSAD.[29] In confirming the FLSAD, Judge Carras' accepted the information presented by the Counties and found that  that all four lakes were hydraulically and hydrologically interrelated, and the continued operation of the dams were of paramount importance to the environment, recreation, property values of lake residents, and the public and economic health of Gladwin and Midland

---

[28] *Id.*

[29] Record #2, Lake Level Order.

Counties.[30] No one appealed the Lake Level Order. The map below depicts the FLSAD as set forth in the Lake Level Order, which also lists the properties in the FLSAD: [31]



The FLSAD consists of 8,170 parcels with 6,278 parcels having direct waterfront access and 1,892 parcels having deeded private access (*i.e.*, easement) to the waterfront (*i.e.*, backlots).[32]

**D. Edenville Dam Failure, May 19, 2020**

Thereafter, the Counties, through their delegated authority, sought to obtain property rights in the dams and bottomlands from the private dam owner, Boyce Hydro. But, before the transaction could be completed, on May 19, 2020, an embankment failed on the Edenville Dam and several hours later excess water from the Edenville Dam failure caused the Sanford Dam to breach. [33] The

---

[30] *Id*.; see also *In the Matter of: Wixom Lake, Sanford Lake, Smallwood Lake and Secord Lake*, Midland Circuit Court Case #19-5980-PZ, Memorandum In Support of Petitions Pursuant to Part 307 of the Michigan Natural Resources and Environmental Protection Act, File April 29, 2019, p3.

[31] Record #2, Lake Level Order, Exhibit A to Lake Level Order.

[32] Record #12, Memorandum "Four Lakes Special Assessment District Assessment Methodology Revised December 2023," p1.

[33] Record #4A, Amendment 1 to County/FLTF Interlocal Agreement, pp 2–3.

upstream dams at Secord and Smallwood lakes were also damaged.[34] And thousands of homes, properties, businesses and public infrastructure were damaged or destroyed by this catastrophic flood event. The region was declared a national disaster.[35]

In the days after the disaster, a strategy was needed to address the immediate recovery efforts and coordinate with federal, state and local agencies. In addition, until the Counties obtained control and ownership of the dams and related properties, no long-term planning could proceed. Accordingly, in June 2020, the Counties appointed FLTF the lead local agency in coordinating the funding, administration, design, improvement, repairs and replacement of the dams, including funding with Federal, State and local agencies.[36]

From 2020 through 2023, massive recovery efforts were undertaken, which included debris removal, shoreline restoration and dam stabilization, as well as planning for the restoration of the dams and lakes.[37] The lake restoration plans included flood studies, design engineering, risk analysis, and environmental assessments.[38] In addition, the Counties proceeded to condemn and secure Boyce Hydro properties and flowage rights in order to undertake the recovery and restoration of the Four Lakes.[39] All pre-construction and recovery work, at a cost of over

---

[34] Record #5, EGLE letter to FLTF, dated June 30, 2021, pp2–3.

[35] Robert Acosta "*President Trump Oks major disaster declaration for mid-Michigan after severe flooding,*" Saginaw and Bay City News, July 9, 2020. https://www.mlive.com/news/saginaw-bay-city/2020/07/president-trump-oks-major-disaster-declaration-for-mid-michigan-after-severe-flooding.html

[36] Record #4A, Amendment 1 to County/FLTF Interlocal Agreement, pp 2–3.

[37] Record #26, "The Four Lakes Restoration Plan," February 2024 Update.

[38] *Id.*

[39] *Id.*

$64,000,000 was accomplished using private donations, state and federal grant with no cost to the properties in the FLSAD.[40]

In May 2021 following the FERC order terminating it prior federal licensing of the Secord, Smallwood and Sanford dams, the dams reverted to the regulatory authority of the State of Michigan.[41] The Edenville Dam (Wixom Lake) came under jurisdiction of the State of Michigan when Boyce Hydro's FERC license was revoked prior to the dam failure. All four dams are now regulated and fall under the jurisdiction of the Michigan Department of Environment, Great Lakes and Energy ("EGLE"), and before construction and restoration of the Four Lakes, must be permitted. All four dams have been given a "high hazard potential ratings" by EGLE. "[A] high hazard potential rating means that the dam is located in an area where a failure may cause significant potential environmental degradation, or where danger to individuals exists with the potential for loss of life."[42] Each dam must comply with dam safety requirements and state regulations and receive state permitting pursuant to Part 315 "Dam Safety" of the NREPA, as well as Part 31 "Water Resources Protection", Part 301 "Inland Lakes and Streams" and Part 303 "Wetland Protection" of the NREPA ("dam and environmental permitting").[43]

FLTF obtained grants from both the federal and State of Michigan in excess of $240,000,000, which, in addition to the recovery work, allowed FLTF to begin the design, dam and environmental

---

[40] Record #25, FLTF Memorandum to Midland and Gladwin County Board of Commissioners re: 2025-29 Operations and Maintenance and Capital Computation of Costs and Assessments Rolls, p2.

[41] Record #5, EGLE letter to FLTF, dated June 30, 2021, p1.

[42] *Id*. at pp 1–2.

[43] *Id*. at pp 1–5; Part 315 "Dam Safety" of the NREPA, MCL 324.3150 *et seq*.; Part 31 "Water Resources Protection," MCL 324.3101 *et seq*.; Part 301 "Inland lakes and Streams," MCL 324.30101 *et seq*.; and Part 303 "Wetland Protection" of the NREPA, MCL 324.30301 *et seq*.

12

permitting, and construction of all four dams ("Lake Level Capital Project").[44] In accordance with its

authority and utilizing federal and state grants, FLTF proceeded to design, obtain necessary permits,

obtain construction bids, and construct the Lake Level Capital Project which, due to the complexity

and state dam safety requirements, was to be completed in phases over multiple years. Restoration

construction began in December 2022 with the awarding of contracts for the Secord and Smallwood

dams, utilizing the funding from the state of Michigan.[45] All four dams, are under construction, with

the final phase of construction that includes the Edenville dam (Wixom Lake) to start in May 2024.[46]

The total cost of the Lake Level Capital Project with contingency is $399,700,000.[47]

In addition, and in accordance with its mandated responsibilities pursuant to Part 307, during

"recovery and restoration of the dams," FLTF is required to:

> "[o]perate and maintain the dams in a safe manner consistent with current industry
> standard practices. FLTF should develop an Operation, Maintenance and Surveillance
> Plan which outlines operational procedures (if any) and type, frequency and reporting
> of monitoring and maintenance at each dam. Emergency action plans are required to
> be developed for each dam in coordination with the County Emergency Managers. The
> plans must be submitted to EGLE for review and should be reviewed annually by FLTF
> and updated accordingly as modifications are made to the dams."[48]

Accordingly, the cost to administer, operate and maintain the FLTF system, was budgeted at

$1,775,200 per year, and for the 5-year period from 2025 through 2029 the total cost for operation and

maintenance is $8,876,600.[49]

---

[44] Record #6, 2022 Public Act 53, p 23.

[45] Record #26, "The Four Lakes Restoration Plan," February 2024 Update.

[46] *Id.*

[47] Record #10 Memorandum: "Capital Assessment for the FLSAD," dated December 21, 2023, p4; Record #11 Updated Memorandum: "Capital Assessment for the FLSAD," dated January 4, 2024, p4; Record #26, "The Four Lakes Restoration Plan," February 2024 Update, p 1.

[48] Record #5, EGLE letter to FLTF, dated June 30, 2021, p 4.

[49] Record #9 Memorandum: "Operations and Maintenance Assessment for the FLSAD," dated December 21, 2023, Appendix A 2025–2029 Computation of Costs, pp 4–5.

CLARKHILL\59824\483263\276989361.v1-4/16/24

### E.  Apportionment Methodology.

Per Part 307, and by resolution, the Counties determined that all costs associated with the administration, construction, operation, maintenance, repair and improvement of the legal or normal levels of the Four Lakes shall be defrayed by special assessments to the properties in the FLSAD.[50] Accordingly, the delegated authority (here, FLTF) is required to distribute or "apportion" project costs to the benefits derived to "privately owned parcels of land, political subdivisions of the state, and state owned lands."[51] The apportionment must equal 100% of the costs. While there can be other sources of funding, the revenue derived from special assessments to waterfront and backlot properties in the FLSAD is considered the *primary* source of funding to restore and maintain the lake and lake level structures.[52]

The FLSAD consists of waterfront properties and backlot properties that have deeded access to the lakes.[53] The FLSAD contains 8,170 parcels, with 6,278 parcels that have direct waterfront access, and 1,892 backlot parcels with lake access.[54] The lake-level special assessments levied on properties within the FLSAD is based on a methodology that uses criteria for determining the benefits derived from the lake level project. Before the dam failure in 2020, the initial apportionment methodology under consideration was derived from existing weed control districts surrounding the Four Lakes.[55] The "previous methodology" considered waterfront lots versus backlots (with deeded access to the lakes), location with respect to the dams, and property use. However, following the dam

---

[50] Record #1, 2018 Resolutions - Midland and Gladwin Counties re: Determination of Normal Levels for the Four Lakes and Establishment of the Four Lakes Special Assessment District.

[51] MCL 324.30711(1).

[52] Record #12, "Four Lake Special Assessment District Methodology," Revised January 2024.

[53] *Id.*, p 1.

[54] *Id.*

[55] *Id.*

failure, FLTF determined that further review of the initial methodology was necessary based on input received from property owners and community leaders.[56]

In May 2021, FLTF established a special assessment work group ("SAD Work Group") led by its consulting engineers, Spicer Group, to discuss, revise and develop an apportionment methodology for apportioning project costs in connection with both the operations and maintenance ("O&M") of the dams, and the capital improvements required to restore the lakes (*i.e.*, Lake Level Capital Project").[57] This SAD Work Group consisted of engineers, geographic information system ("GIS") specialists, assessment advisors, individuals familiar with levying special assessments and legal counsel. [58] FLTF then shared the proposed apportionment methodology with the public in an informational webinar on December 6, 2021.[59] This methodology was used for the 2022–2024 operations and maintenance assessment, which went through and extensive process of review as well, in addition and estimated Project Cost and Capital Assessment estimate was provided in 2022.

In 2023, the special assessment methodology was revised, reflecting changes based on the fact the capital assessment was larger than estimated and conditions found in property differences. The final version of the apportionment methodology to apportion the O&M and the Lake Level Capital Project, was approved by FLTF at the special assessment hearing on January 15, 2024. The Four Lakes Special Assessment District - Assessment Methodology, Revised January 2024, is set forth in Record #12 of the Record on Appeal.

---

[56] *Id.*

[57] *Id.*, p1.

[58] *Id.*

[59] https://www.four-lakes-taskforce-mi.com/uploads/1/2/3/1/123199575/dec_6._community_info_session_final_12.6.21.pdf, Appellants' Ex F.

CLARKHILL\59824\483263\276989361.v1-4/16/24

To apportion the O&M and Lake Level Capital Project costs to property owners within the FLSAD, the FLTF employed a comprehensive apportionment methodology that apportions costs to lakefront property owners and backlot property owners with deeded access to the lakes. The apportionment methodology for determining benefits derived uses the following benefit factors:[60]

1. **Base benefit factor**. All parcels (waterfront and backlots) within the FLSAD are assigned a base factor of either: 0, 0.5 or 1. All parcels which are exempt, such as school properties or cemeteries and properties in the FLSAD that receive no benefit are assigned a "0" base factor, which results in no assessment. All "backlot parcels" that are not directly on a body of water but have private access to the lake, receive a base factor of "0.5." All other parcels (waterfront) receive a base factor of "1."

2. **Derived Benefit Factor**. The derived benefit factor is a factor applied to non-residential or limited development/use residential development parcels (such as marinas, commercial properties, state land, local parks, trailer parks/campgrounds, and agriculture) within the FLSAD that have various amounts of use and is calculated similar to frontage. See Record #12, Four Lakes Special Assessment District - Assessment Methodology, Revised January 2024; Table 1, p. 4.

3. **Frontage Benefit Factor**. The frontage factor is applied <u>solely</u> to parcels with direct access to the water. The frontage for all waterfront parcels was determined by three methods: (1) review of all subdivision plats; (2) review of metes and bounds description for un-platted parcels, and (3) utilizing GIS to manually measure the frontage based on parcel linework and aerial photography. Once parcel frontage was determined, parcels were grouped (A through F) according number of feet of frontage, and then assigned a benefit factor weighted according to number of feet of frontage. <u>Below is the Table 2</u> from Record #12, Four Lakes Special Assessment District - Assessment Methodology, Revised January 2024; Table 1, p. 5:

---

[60] This section summarizes the methodology. For a full understanding, please see Record #12, Four Lakes Special Assessment District - Assessment Methodology, Revised January 2024.

16

*Table 2: Lake frontage bracket*

| Low (feet) | High (feet) | Group | Factor |
|---|---|---|---|
| 0 | 48 | A | 0.8 |
| 48 | 134 | B | 1 |
| 134 | 175 | C | 1.25 |
| 175 | 220 | D | 1.5 |
| 220 | 2,000 | E | 1.75 |
| Greater than 2,000* | | F | 2 |

*\*Changed from 2,000-7,900 in the July 2022 special assessment methodology to 2,000+*

The Frontage benefit factor is then calculated similar to how income taxes are calculated such that if you have a parcel with 200 feet of frontage -- for the first 48 feet, a factor of 0.8 is applied, and the next 86 feet a factor of 1 is applied. The greater the frontage the higher the benefit factor. Below is an example of calculating the frontage benefit factor for a parcel with 200 feet of frontage:

**Example calculation: parcel with 200 feet of frontage**

(1st bracket): 48 feet * 0.8 = 38.4 feet

(2nd bracket): 86 feet * 1 = 86 feet

(3rd bracket): 41 feet * 1.25 = 51.25 feet

(Determine frontage to be applied to 4th bracket): 200 feet – 48 feet – 86 feet – 41 feet = 25 feet. Step 4 will vary based on total amount of frontage.

(4th bracket): 25 feet * 1.5 = 37.5 feet

(Sum of frontages): 38.4 feet + 86 feet + 51.25 feet + 37.5 feet = 213.15 feet

(Divide total frontage by sum to get weight factor): 213.15 feet/200 feet = 1.07

4.  **Waterfront View Benefit Factor**. The waterfront view factor measures the width of the waterway in front of a parcel perpendicular to its frontage and is intended to account for parcels located on canals and tributaries which receives a reduction in benefit as compared to those located directly on a lake.

5.  **Water Depth Benefit Factor**. This factor is intended to account for the quality of lake access and opportunity for a property owner to install a dock to achieve greater water depth. The lower the water depth, the lower the benefit factor.

Below is an illustration calculating the derived benefit applied to a typical waterfront residential

property within a subdivision[61]:

---

[61] *Id.*

CLARKHILL\59824\483263\276989361.v1-4/16/24

**Example Calculation: Typical residential property within a subdivision**

Assessable lakefront property – Base Factor (BF) = 1

90 feet of water frontage – Frontage Factor (FF) = 0.893

Greater than 500 feet of waterfront view – Waterfront View Factor (WV) = 1

Water depth of 4 feet or greater – Water Depth Factor (WD) = 1

Residential property – Derived Factor (DF) = 1

Product of factors – BF x FF x WV x WD x DF = 1 x 0.893 x 1 x 1 x 1 = 0.893

Parcel apportionment – parcel's total benefit factor divided by the sum of all factors in SAD* = 0.893/4973 = 0.0001796 or 0.018%

Estimated total O&M Assessment – (Computation of cost amount – at large assessment) x parcel apportionment = (8,876,000 – 798,840) x 0.0180% = $1,450.00

Estimated annual O&M assessment = Total O&M divided by 5 years = $1,450.00/5 years = $290.08/1 year

*The sum of all factors is calculated by adding all the total factors for all parcels together. The sum is subject to change as it is tied to all the factors in the district. If the total factor of one parcel changes, the sum of all factors also changes.

For backlots with deeded access to a lake, the base factor is 0.5, but then it takes into consideration that not all backlots provide the same quality of access. Research determined that there were three primary lake access "types" that exist within the Four Lakes system and include: (1) Non-developed/un-maintained access where the subdivision allow for backlot access to the lake, but the access location was not developed or maintained as intended. Parcels with low access to the lake will have the lowest total factor in the lake level special assessment district; (2) Maintained minor access, which provide parcels with walkways, parks or road ends, but were not intended or developed as high-volume access points for a boat launch or dock slip; and (3) Maintained major access, where parcels have access to launch boats and or have boat slips, allowing for quality access for backlot property owners. Backlots with maintained major access will have the highest access benefit factor. The lowest quality backlots have a total apportionment factor of 0.075, while backlots with the higher quality of access are capped at 0.5 base factor.[62]

---

[62] *Id*. at 8–9.

The foregoing methodology is designed to ensure that costs are borne by properties with greater amount and superior frontage, or in the case of backlots, properties with the same access whether improved or not improved (as in the case vacant backlots) receive the same derived benefit and pay will have the same lake level special assessments. In other words, the methodology does not look at a property's state equalized value ("SEV") or market value, as such information would result in a disproportional derived benefit based on the property owner's choices whether to improve or not improve the property, such as keeping a property vacant, or improving the property with a garage, small or large home.

The total cost of the Lake Level Capital Project with contingency is $399,700,000.[63] After receiving bids and computing the final costs of the project, FLTF prepared a capital special assessment roll levying approximately 55% of the costs (or $217,700,000) of the project to the property owners in the Four Lakes Special Assessment District in order to "defray" the capital costs of the Lake Level Project utilizing the apportionment methodology described above.[64] The difference or $182,000,000 is being primarily subsidized with public funds received primarily from the state of Michigan. The plan of financing called for spreading the lake level capital special assessments via annual installments not to exceed 40 years. In addition, FLTF prepared a separate operation and maintenance special assessment roll for the years 2025 through 2029 to cover the expenses required to administer, operate and maintain the Four Lakes system during construction (*i.e.*, $1,775,200 per year).[65] The O&M lake level special

---

[63] Record #11 Updated Memorandum: "Capital Assessment for the FLSAD," dated January 4, 2024, p 4; Record #26, "The Four Lakes Restoration Plan," February 2024 Update, p 1.

[64] *Id*. at p 4; Record #12, January 2024 Apportionment Methodology, pp 2–10; Record #36 Approved Capital Assessment Roll, p 1.

[65] Record #9, Re: Operations and Maintenance Special Assessment for the FLSAD, dated December 21, 2023, p 1–5; Record #34, 5-Year Operation and Maintenance Special Assessment Roll.

19

assessment roll allocates 90.14% of these costs to the landowners, and the remaining 9.86% of the cost to public corporations and to the Michigan Department of Natural Resources.[66]

The table below list the annual payment for both the O&M lake level special assessment and the Lake Level Capital Project special assessments for a range of properties in the FLSAD. Almost all waterfront residential properties have an annual payment between $1,440 to $2,880 per year with a typical waterfront property at $2,160 per year. Most Backlots have a 0.25 benefit factor and will generally pay $720/year, however, backlots range from $216/year to $1,440/year depending on the access quality.[67]

| Total Annual Payment for O&M and Capital Assessments | | | | |
|---|---|---|---|---|
| Benefit Factor Assigned | 2025-2029 O&M Annual Assessment Payment | Capital Assessment Annual Payment (Principal + Interest on $217.7M) | Total Average Annual Payment (O&M + Capital) | Total Principal* Estimate ($217.7M total) *This is the amount to prepay to pay off the assessment |
| 1 (High Residential Lot) | $          320 | $          2,560 | $          2,880 | $          43,760 |
| 0.75 (Typical Front Lot) | $          240 | $          1,920 | $          2,160 | $          32,820 |
| 0.5 (Lowest Front Lot) | $          160 | $          1,280 | $          1,440 | $          21,880 |
| 0.25 (Typical Backlot) | $          80 | $          640 | $          720 | $          10,940 |
| 0.075 (Lowest Backlot) | $          24 | $          192 | $          216 | $          3,282 |

Currently, these are based on a 5% interest rate and a 40-year term. These are average numbers over the life of the financing term.

## F. Four Lakes Lake Level Special Assessment Hearing; and Heron Cove Association Appeal.

FLTF held the lake level special assessment hearing in connection with the O&M and Lake Level Capital Project special assessment rolls for January 15, 2024.[68] Prior to that date, on December 6, 2023 FLTF held a webinar to inform property owners within the FLSAD of the updated project costs

---

[66] Record #34, Approved 5-year O&M Four Lakes Level Special Assessment Roll, p 1.

[67] Record #25, FLTF Recommendation to Counties, Dated January 30, 2024.

[68] Record #13, Notice of Lake Level Special Assessment Hearing.

and estimated special assessment amounts for the capital improvements to the lakes and costs required for operation and maintenance ("O&M").[69] Also at that time, FLTF created a "virtual map" that was posted online which illustrated the estimated capital and O&M lake level special assessment to each individual parcel in the FLSAD.[70] This "virtual map" allowed any property owner within the FLSAD to log on and locate their respective property or properties to observe the apportionment benefit factors applied to their property that was used to calculate the lake level special assessment.[71] In addition, although not mandatory, throughout December 2023 through January 15, 2024, FLTF conducted "one-on-one" virtual meetings with landowners to review apportionment benefit factors affecting their specific properties. During these virtual meetings, and through email or written correspondence, landowners had the opportunity to provide additional information and have their parcel reviewed in connection with the apportionment factors that were applied to their property, to calculate its derived benefit, and also to submit written objections.[72] In the course of the "one-on-one" virtual meetings with landowners, "over 780 adjustments" were made to properties where property owners availed themselves of the review process prior to the January 15 lake level special assessment hearing.[73]

As described above, the apportionment methodology used to calculate the lake level special assessments depends first on whether a property is a waterfront or a backlot with deeded access. In the case of a waterfront property, the apportionment methodology for determining the benefits derived considered the following benefit factors: (1) base; (2) derived benefit; (3) frontage; (4) waterfront view;

---

[69] See https://www.four-lakes-taskforce-mi.com/events.html "December 6, 2023, 5:00–7:00 p.m. | Day of Review Process | Webinar | PowerPoint"

[70] Record #13, Notice of Lake Level Special Assessment Hearing; and special assessment maps https://www.four-lakes-taskforce-mi.com/

[71] *Id.* at https://www.four-lakes-taskforce-mi.com/

[72] *Id.*

[73] Record #19 FLTF Lake Level Special Assessment Hearing Transcript, 20:13–25;

21

and (5) water depth. The apportionment methodology for determining the benefits derived to backlots (with deeded access to the lake) considered the following benefit factors: (1) base; (2) whether the access was non-developed or not maintained; (3) minor access (*e.g.*, walkways, paths, but not intended as high volume access); or major access (*e.g.*, boat launch). If a change in the factors applied to a specific property were warranted, the lake level assessment roll was updated, and landowner informed.

Below, is an illustration of the information set forth in the "virtual map" that details the location for each property in the FLSAD, apportionment factor breakdown and lake level special assessment for O&M and the Lake Level Capital Project:



In the above example, the above property (130-160-000-008-00) shows an assessment factor breakdown, the apportionments and lake level assessments for both O&M and the Lake Level Capital Project. In this case, the annual assessment for O&M for the period of 2025–2029 is $248.08 per year.

CLARKHILL\59824\483263\276989361.v1-4/16/24

The total Lake Level Capital Assessment of $33,431.46, or $1,948.32 per year (which includes 5% estimated interest rate) paid over 40 installments.[74]

On January 15, 2024, FLTF held the required public hearing in connection with the lake level special assessment rolls. The notice of hearing was prepared in accordance with the requirements of Section 30714 of Part 307, which includes the notice requirements set forth in Public Act 162, *supra*.[75] The notice was mailed to each property owner and published twice in both the *Midland Daily News* and *Gladwin County Record*. [76] The notice provided that in order to appeal the amount of the operation and maintenance assessment and/or capital improvement special assessment, "*any person or entity objecting*" shall appear at the special assessment hearing or file their objection in writing with the FLTF "no later than the close of the public hearing; or any such person or entity may file an appearance and protest by e-mail to info@fourlakestaskforce.org with "Objection" in the subject line, or by letter" to the FLTF "in which case, his or her personal appearance at the public hearing shall not be required."[77]

On January 15, FLTF administrative staff presented the computation of costs in connection with the 5-year O&M lake level special assessment roll, and the computation of costs for the Lake Level Capital Project special assessment roll.[78] In addition, Ron Hansen, PE, from the Spicer Group, also gave a brief overview of the apportionment methodology and the number of adjustments made to individual properties based on the information provided by landowners relative to the specific conditions of their

---

[74] See, link special assessment maps: https://www.four-lakes-taskforce-mi.com/

[75] Record #13, Notice of Public Hearing.

[76] *Id.* and Record #14, Affidavit of Mailing and Positing FLSAD Hearing; Record #15 Affidavit of Publication (*Midland Daily News*); and Record #16, Affidavit of Publication (*Gladwin County Record*).

[77] Record #13, Notice of Public Hearing.

[78] Record #17 FLTF January 15, 2024 Agenda Special Assessment Hearing and FLTF Board meeting, p1; Record #18 Minutes, FLTF Special Assessment Hearing and FLTF Board meeting, pp 1–3; Record #19 FLTF Lake Level Special Assessment Hearing Transcript, pp 14–19.

properties that were affected by the benefit factors.[79] In all, prior to the hearing, over 780 properties had adjustments affecting their respective properties after providing information and discussing the same with FLTF's consultant.[80] FLTF then opened the hearing to receive objections and comments from property owners within the FLSAD.[81] At that time, landowners with questions or concerns as to the apportionment factors that were used to calculate their special assessment were encouraged to and had the opportunity to meet directly with a representative from FLTF's engineering consultant, the Spicer Group.[82] Following the January 15 lake level special assessment hearing, FLTF revised the special assessment rolls based on the objections and comments received from landowners.[83] The revised lake level special assessment rolls were then transmitted to the Counties for consideration.

On February 6, in a joint meeting of the Counties' respective board of commissioners, the Counties approved the lake level operation and maintenance special assessment roll and the capital improvement special assessment roll.[84] In addition, the Counties approved the financing plan for the Lake Level Project that will provide long-term financing in the aggregate principal amount not to exceed $217,700,000 (which includes a contingency of $34,584,150) to be secured by and payable from the collection of lake level special assessments against properties in the FLSAD.[85]

[79] Record #19 FLTF Lake Level Special Assessment Hearing Transcript, pp 19–22.

[80] *Id.* at 20:16–18.

[81] Record #17 FLTF January 15, 2024 Agenda Special Assessment Hearing and FLTF Board meeting, p1; Record #18 Minutes, FLTF Special Assessment Hearing and FLTF Board meeting, pp 1–3; Record #19 FLTF Lake Level Special Assessment Hearing Transcript; Record #20, List of Attendees at lake level special assessment hearing, and Record #21, Written Objections.

[82] Record #19 FLTF Lake Level Special Assessment Hearing Transcript, 24:21–25; 25:1–15.

[83] Record #18 Minutes, FLTF Special Assessment Hearing and FLTF Board meeting, p2.

[84] Record #9 through #12; Record #22; Record #25; Record #26; Record #32 through #37.

[85] Record #30 Midland County Resolution Approving Financing Plan; Record #3, Gladwin County Resolution #2024-009 Approving Financing Plan.

On or about February 20, 2024, Appellants filed their original Claim of Appeal, which was amended on February 21. Aside from the HCA, the caption listed 992 names that purport to be property owners in the FLSAD. On February 26, 2024, Appellees filed the Record on Appeal and served Appellants' counsel. The lengthy caption for this appeal lists the HCA, a Michigan non-profit corporation, on behalf of several persons/entities. *See* Claim of Appeal. The Claim of Appeal asserts that the HCA "[i]s comprised of property owners and those with property interests within the Four Lakes Special Assessment District or adjacent to it. Individual appellants are members of the HCA who own or have interest in property within the Four Lakes Special Assessment District. Each appellant has standing to claim this appeal . . . ."[86]

A review of the record from the January 15 Lake Level Special Assessment Hearing shows that the HCA was not represented and did not present any objections to the approved assessment rolls. In addition, on information and belief, there are at least 36 persons/entities listed in the caption (of the Claim of Appeal) that do not appear to have any property interests within the FLSAD.  Moreover, there are 437 properties of persons listed in the caption (of the Claim of Appeal) that did not timely object or submit written objections at or before the January 15 lake level special assessment hearing. See **Appellees' Ex A**. Finally, there are only 248 properties of the persons listed in the caption that formally objected. But these property owners did not submit any evidence to support their claims that the assessments were contrary to law or were arbitrary and capricious.

---

[86] (Claim of Appeal, ¶ 12)

CLARKHILL\59824\483263\276989361.v1-4/16/24

# ARGUMENT

## I.   Appellant HCA Lacks Standing To Bring The Claim of Appeal To Set Aside The Lake Level Assessment Rolls Approved By the Appellees.

### A.   Standard of Review – Standing to Sue.

Summary disposition is appropriate under MCR 2.116(C)(10) where a plaintiff lacks standing to sue. See, *Pontiac Police & Fire Retirees v Pontiac No 2*, 309 Mich App 611, 617–18; 873 NW2d 783 (2015). In reviewing a motion for summary disposition under MCR 2.116(C)(10), the court must consider the pleadings, depositions, admissions, affidavits, and other documentary evidence submitted by the parties. MCR 2.116(G)(5); *Kosmalski ex rel Kosmalski v St John's Lutheran Church*, 261 Mich App 56, 59; 680 NW2d 50 (2004). Under MCR 2.116(C)(10), summary disposition is appropriate when "there is no genuine issue as to any material fact, and the moving party is entitled to judgment or partial judgment as a matter of law." MCR 2.116(C)(10); *West v Gen Motors Corp*, 469 Mich 177, 183; 665 NW2d 468 (2003).

Standing refers to the right of a party to invoke the power of the court to adjudicate a claimed injury in fact. *Federated Ins Co v Oakland Co Rd Comm,* 475 Mich 286, 291; 715 NW2d 846 (2006).

> MCR 2.201(B) provides that "[a]n action must be prosecuted in the name of the real party in interest...." The real party in interest is a party who is vested with a right of action in a given claim, although the beneficial interest may be with another. *In re Beatrice Rottenberg Living Trust,* 300 Mich App at 356; 833 NW2d 384; *Barclae,* 300 Mich App at 483; 834 NW2d 100. In general, standing requires a party to have a sufficient interest in the outcome of litigation to ensure vigorous advocacy and 'in an individual or representative capacity some real interest in the cause of action, or a legal or equitable right, title, or interest in the subject matter of the controversy.' *Bowie v Arder,* 441 Mich 23, 42; 490 NW2d 568 (1992) (citation and quotation marks omitted); see also *Lansing Sch Ed Ass'n v Lansing Board of Educ,* 487 Mich. at 355–56; 792 NW2d 686. Both the doctrine of standing and the included real-party-in-interest rule are prudential limitations on a litigant's ability to raise the legal rights of another. *Lansing Sch Ed Ass'n,* 487 Mich

26

at 355–356; 792 NW2d 686; *In re Beatrice Rottenberg Living Trust,* 300 Mich App at 355; 833 NW2d 384. Further, "a litigant has standing whenever there is a legal cause of action." *Lansing Sch Ed Ass'n,* 487 Mich at 372; 792 NW2d 686. But plaintiffs must assert their own legal rights and cannot rest their claims to relief on the rights or interests of third parties. *Barclae,* 300 Mich App at 483; 834 NW2d 100. The real party in interest is one who is vested with the right of action as to a particular claim, or, stated otherwise, is the party who under the substantive law in question owns the claim asserted. *In re Beatrice Rottenberg Living Trust,* 300 Mich App at 356; 833 NW2d 384.

*Pontiac Police & Fire Retirees*, *supra* 309 Mich App at 621–22.

A private citizen does not have standing if he or she is unable to establish that he or she has been harmed in a manner different than a member of the general public. *Detroit Fire Fighters Ass'n. v. City of Detroit,* 449 Mich 629, 634; 537 NW2d 436 (1995).

An organization will have standing to advocate the interests of its members "where the members themselves have a sufficient stake or have sufficiently adverse and real interests in the matter being litigated." *Trout Unlimited, Muskegon–White River Chapter v City of White Cloud,* 195 Mich App 343, 348; 489 NW2d 188 (1992). In other words, "organizations . . . have standing to bring suit in the interest of their members where such members would have standing as individual plaintiffs." *Nat'l Wildlife, supra* at 629; 684 NW2d 800.

*MOSES Inc*, supra, at 414.

**B.     Appellant HCA Lacks Standing To Represent Members Listed In The Caption Of The Claim Of Appeal Where Such Members Claims Regarding The Lake Level Special Assessments Levied are Inherently Antagonistic, Separate and Unique and HCA's Representation is Akin to Advocating the Interests of the General Public.**

HCA lacks standing because as an organization, in this instance, it cannot represent multiple persons or entities where each of the named parties' claims against the Appellees are inherently antagonistic, separate, and unique from each other. MCR 2.201(B) provides that: "An action must be prosecuted in the name of the real party in interest...." Lake special assessment rolls, as in this case, are compiled using an apportionment methodology, which calculates the percentage of the project costs and benefits derived to each specific property based on the general characteristics of that property.

27

The total apportionment must equal 100%. Consequently, decreases in the apportionment of one property or class of properties, requires an increase to other properties (and by design, the special assessments) in the lake-level special assessment district. In other words, each of the purported property owners listed in the caption on appeal (assuming they have property in the FLSAD and perfected their right to appeal by objecting to the at the special assessment hearing) has uniquely different claims in connection with the assessment to their property—which makes them antagonistic to one another.

HCA's brief proves this. HCA attacks Appellees apportionment methodology alleging that methodology was arbitrary and capricious asserting that it does not account for "actual benefit to that property." (Appellants' Br 11.) But later, it criticizes Appellees' apportionment methodology for not considering certain factors or differences between property owners who live upstream of the dams as compared to downstream property owners. (Appellants' Br 14). HCA claims that the Appellees apportioned the assessment without regard to proportionality, and then cherry picks only 12 properties of the purported 992 HCA members. Then it further advances the misleading argument regarding alleged disproportionality for just two properties (ignoring that there are 8,170 properties in the FLSAD). (Appellants Br, p 16). Aside from the fact that the two examples presented misrepresent the application of the apportionment methodology, the SEV information presented by Appellants shows that each property and the respective property owners have distinctly different claims. And the outcome, whether in favor of one property or class of properties, affects other properties in the FLSAD.

Also, none of the purported property owners listed in the caption *even bothered to submit evidence* at the lake level special assessment hearing that could or would have been addressed by the Appellee at that time of the hearing.

28

Because each person or entity listed in the caption has distinctly different claims, HCA's representation is akin to advocating the interest of the general public. It thus lacks standing.

**C.**   **Appellant HCA Lacks Standing To Represent Members Listed In The Caption Of The Claim Of Appeal Where Such Members Either Do Not Own Property In The FLSAD Or Did Not Perfect The Right to Appeal By Failing to Object at The Hearing.**

Section 30714 of Part 307 provides:

 (1) A special assessment roll shall describe the parcels of land to be assessed, the name of the owner of each parcel, if known, and the dollar amount of the assessment against each parcel.

 (2) The delegated authority shall set a time and place for a public hearing or hearings on the project cost and the special assessment roll. Notice of a hearing shall be by both of the following:

 (a) By publication of notice at least twice prior to the hearing in a newspaper that circulates in the special assessment district, the first publication to be at least 10 days before the hearing.

 (b) As provided in Act No. 162 of the Public Acts of 1962, being sections 211.741 to 211.746 of the Michigan Compiled Laws.

 (3) At or after a public hearing, the delegated authority may approve or revise the cost of the project or the special assessment roll. Before construction of a project is begun, the county board shall approve the cost and the special assessment roll by resolution.

 (4) The special assessment roll with the assessments listed shall be final and conclusive unless appealed in a court within 15 days after county board approval.

The notice of hearing requirements of Public Act, in pertinent part provides:

 (2) The notice of hearing shall include a statement that appearance and protest at the hearing in the special assessment proceedings is required in order to appeal the amount of the special assessment to the state tax tribunal[87] and shall describe the manner in which an appearance and protest shall be made.

---

[87] The Michigan tax tribunal lacks subject-matter jurisdiction to hear lake level appeals. See *In re Project Cost and Special Assessment Roll For Chappel Dam*, 282 Mich App 142, 145, and 147; 762 NW2d 192 (2009); see also, *USL Improvement Assoc. v. Oceana County Drain Commissioner*, <u>unpublished</u>, Docket Nos. 297157, 298080, March 13, 2012 (*Held*: Subject matter jurisdiction

CLARKHILL\59824\483263\276989361.v1-4/16/24

(3) An owner or party in interest, or his or her agent may appear in person at the hearing to protest the special assessment, or shall be permitted to file his or her appearance or protest by letter and his or her personal appearance shall not be required.

(4) The governing body shall maintain a record of parties who appear to protest at the hearing. If a hearing is terminated or adjourned for the day before a party is provided the opportunity to be heard, a party whose appearance was recorded is considered to have protested the special assessment in person.

Michigan courts have recognized that "a protest of an assessment before the local board of review is clearly required before the tribunal may acquire jurisdiction." *Manor House Apartments v City of Warren*, 204 Mich App 603, 605; 516 NW2d 530 (1994). The Tax Tribunal properly grants summary disposition to a respondent on the basis of the lack of subject-matter jurisdiction when the petitioner fails to timely file the petition or protest the assessment at the local level as required by law. *Kelser v Dep't of Treasury*, 167 Mich App 18, 20–21; 421 NW2d 558 (1988).

Appellant, HCA contends that "[I]ndividual appellants are members of the Heron Cove Association who own or have an interest in property within the Four Lakes Special Assessment District", and that "[E]ach appellant has standing to claim this appeal." (*Id.*)

The FLSAD consists of 8,170 parcels, with 6,278 parcels having direct waterfront access and 1,892 parcels having deeded private access to the waterfront (backlots). Aside from Appellant, HCA, there are 974 separate persons/entities listed in the Claim of Appeal.[88] A review of the names to the properties within the FLSAD show that 36 persons/entities listed in the caption do not own property in the FLSAD and hence, were not assessed for the Lake Level Capital Project or for O&M. Clearly,

---

does not rest with the Michigan Tax Tribunal, but with the circuit court to hear lake level special assessment appeals).

[88] The amended caption actually lists 992 persons/entities that HCA purports to represent, however, following the filing of Appellants' Brief, 18 persons named in the caption requested to be removed and a stipulation was entered between the parties to amend the caption and removed those individuals and properties from the appeal.

these properties have not suffered an "injury in fact" that would invoke standing to sue in connection with the approval of the special assessment rolls. Accordingly, these property owners should be dismissed. **Appellees' Ex A.**

Next, 437 the persons identified in the caption never bothered to appear at the January 15 lake level special assessment hearing to formally object or provide evidence that the FLTF's methodology and special assessments were contrary to law, or was arbitrary, capricious or fraudulent. **Appellees' Ex A.** As indicated above, before approving a lake level special assessment roll, the Part 307 process requires a hearing to receive objections, and then requires property owners to appeal the roll following the approval of the county board of commissioners. The failure to object and submit evidence at the hearing is fatal to those property owners' right to appeal. Otherwise, why have a hearing at all? Indeed, because Appellants' argument claim that FLTF and the Counties lacked substantial, competent, and material evidence, this failure is particularly crucial, how can they object to purportedly insufficient evidence when they did not present *anything*?

Accordingly, Appellant, HCA and those property owners that did not appear and object at the January 15 lake level special assessment hearing should be dismissed.

Finally, only 248 properties of the persons listed in the caption formally objected at the January 15 lake level special assessment hearing. But even those did not submit any evidence to support the claims alleged—*i.e.*, that the assessments were contrary to law or arbitrary and capricious. HCA and the remaining property owners should not be permitted to add new evidence and rehash the facts. Accordingly, this Court should dismiss this Appeal in full.

CLARKHILL\59824\483263\276989361.v1-4/16/24

II.     **The Delegated Authority and Board of Commissioners' Approval of the Lake Level Special Assessment Rolls Was Not Contrary to Law.**

A.      **Standard of Review: Appellants wrongly insert an inapplicable review standard, and—in any event—the Counties complied with applicable law.**

On the merits, Appellants' brief starts off on the wrong foot by building its first argument around an inapplicable standard of review. Namely, Appellants attack the special assessment rolls as "not supported by competent, material, and substantial evidence on the whole record." (Appellants Br., pp. 9–12.) But "substantial evidence" review is limited to those circumstances where an administrative body is required to conduct a trial-like evidentiary proceeding, such as a contested case. See, e.g., MCL 24.271–24.288. None occurred here.

Rather, the Counties followed the procedures under Part 307, which prescribes a less-formal public notice and public hearing, providing an opportunity for public comment but not demanding a trial-like procedure involving the admission and weighing of evidence. *In re Project Costs & Special Assessment Roll for Chappel Dam*, 282 Mich App 142, 150, 762 NW2d 192 (2009) (Part 307 guarantees notice and opportunity to be heard before the determination of a special-assessment roll; not a full trial). In other words, because there was no trial-like administrative hearing, there is no reason for this to review the factual support for the Counties' decision in the same way that an appellate body would review the factual findings of a trial court. Indeed, it *cannot* do so; the substantial evidence standard is simply inapplicable. *Ross v Blue Care Network of Mich,* 480 Mich 153, 164; 747 NW2d 828 (2008), citing Const 1963, art 6, § 28. Consequently, Appellants' first argument is wholly misplaced.

Yet, even if this Court wrongly assumed that type of review to be applicable here, the Counties would still pass with flying colors. The Counties' methodology for apportioning the costs of the lake level special assessment rolls among lakefront and backlot property owners who benefit

from the Four Lakes satisfies all relevant criteria. Thus, in any event, Appellants have no valid basis to challenge the lake levels special assessment rolls, and this Court should affirm.

1.   **The "substantial evidence" test does not apply here because no formal evidentiary hearing was required.**

Because no evidentiary hearing was required here, the "substantial evidence" review standard simply does not apply. In other words, in the absence of a trial-like proceeding to review, circuit courts sitting as appellate courts over administrative bodies do not test the evidentiary basis for those bodies' decisions. Rather, the applicable standard of review simply tests whether the decision is "authorized by law"—*i.e.*, did the body comply with the law? The Counties meet that standard.

2.   **This Court only reviews administrative decisions under the "substantial evidence" test where an evidentiary hearing is required by law.**

The Michigan Constitution provides that review of administrative agencies' decisions are subject to judicial review as follows:

> All final decisions, findings, rulings and orders of any administrative officer or agency existing under the constitution or by law, which are judicial or quasi-judicial and affect private rights or licenses, shall be subject to direct review by the courts as provided by law. This review shall include, as a minimum, the determination whether such final decisions, findings, rulings and orders are authorized by law; *and, <u>in cases in which a hearing is required</u>, whether the same are supported by competent, material and substantial evidence on the whole record*. [Const 1963, art 6, § 28 (emphasis added).]

Substantial-evidence review is akin to the review that appellate courts apply to a trial court's fact-finding, *i.e.*, a form of clearly erroneous review. *Boyd v Civil Serv Comm'n*, 220 Mich App 226, 234–35; 559 NW2d 342 (1996) (observing the "standard is indistinguishable from the clearly erroneous standard of review that has been widely adopted in Michigan jurisprudence."); *Vanzandt v State Employees Ret Sys*, 266 Mich App 579, 585; 701 NW2d 214 (2005) (commenting that "the

substantial evidence test to the agency's factual findings . . . is essentially a clearly erroneous standard of review"). Caselaw is clear that the "substantial evidence" standard is a highly deferential form of review. *Id*. at 588 ("Such review must be undertaken with considerable sensitivity in order that the courts accord due deference to administrative expertise and not invade the province of exclusive administrative fact-finding by displacing an agency's choice between two reasonably differing views"), quoting *Michigan Employment Relations Comm'n v Detroit Symphony Orchestra, Inc.,* 393 Mich 116, 124; 223 NW2d 283 (1974). And a court may not substitute its judgment for the administrative body. *Mudel v Great Atl & Pac Tea Co*, 462 Mich 691, 706; 614 NW2d 607 (2000) (noting a court "may not substitute [its] own judgment for" that of the agency).

Notwithstanding the deference ordinarily given to an administrative body's fact-finding, the standard only applies in limited circumstances: namely, when such a body is required to make factual findings following an evidentiary hearing. As the constitutional text says, it is only applicable "in cases in which *a hearing is required*." Const 1963, art 6, § 28. If no hearing is required, then substantial-evidence review does not apply at all. *Ross*, 480 Mich at 164 ("Decisions of an administrative agency or officer, in cases in which no hearing is required, are reviewed to determine whether the decisions are authorized by law."); see also *Henderson v Civ Serv Comm'n*, 321 Mich App 25, 38–40; 913 NW2d 665, 672–73 (2017), quoting *Brandon Sch Dist v Mich Ed Special Servs Ass'n*, 191 Mich App 257, 263; 477 NW2d 138 (1991) ("Where no hearing is required, *it is not proper* for the circuit court or this Court to review the evidentiary support of an administrative agency's determination.") (emphasis added). Not otherwise.

In other words, this standard of review that is analogous to an appellate review of a trial court's fact-finding only applies when an administrative body uses trial-like procedures. For example,

administrative bodies often permit "contested cases," which permit the subpoenaing, calling, and cross-examination of witnesses, MCL 24.273, MCL 24.272(4); establish evidentiary standards, MCL 24.275 ("the rules of evidence as applied in a nonjury civil case in circuit court shall be followed as far as practicable"); allow for legal and factual arguments, MCL 24.272(3); introduction of documentary evidence, MCL 24.276; officially noticed facts, MCL 24.277; factual stipulations, MCL 24.278(1); and ultimately, findings of fact "based exclusively on the evidence and on matters officially noticed." MCL 24.285. But, if the law does not require such procedures, then the standard is simply inapposite. *Wescott v Civ Serv Comm'n*, 298 Mich App 158, 162; 825 NW2d 674, 676–77 (2012).

### 3.   Part 307 did not require nor did the Counties conduct a trial-like evidentiary proceeding.

Part 307 does not require a trial-like evidentiary proceedings culminating in factual findings based on an evidentiary record. *In re Chappel Dam, supra*. Instead, the Legislature believed that it was sufficient to create a process whereby property owners could file written comments or make oral objections at a public hearing, submit evidence and thereafter appeal to a judicial body any *legal* error.

Specifically, MCL 324.30714(2) provides that "[t]he delegated authority shall set a time and place for a public hearing or hearings on the project cost and the special assessment roll." Then the delegated authority (here, FLTF) must provide notice by newspaper circulation and in the manner required for special assessments under the 1962 PA 162. MCL 324.30714(2)(a) & (2)(b); see also MCL 211.741–746. Lastly, the delegated authority must hold a public hearing to "approve or revise the cost of the project or the special assessment roll," MCL 324.30714(3), and "the county board" must also approved the roll. *Id*.

No full evidentiary hearing is required. No "contested case" is provided for. No formal factual findings are required to be made by either the delegated authority or the Counties. In other words, this action is more akin to the quasi-legislative decisions of many municipal and state boards than it is to the quasi-judicial, trial-like proceedings required (or allowed) for certain administrative actions. And the substantial-evidence standard applicable to fact-findings of administrative bodies is inapplicable.

Because the Legislature did not create a trial-like evidentiary proceeding in Part 307, the "substantial evidence" review standard does not apply. In other words, Appellants' argument based upon that inapplicable standard is simply misplaced. Thus, this Court should affirm.

### 4. Lake Level Special Assessments Made by the Delegated Authority Is Afforded Great Deference.

But, even if this Court applies a "substantial evidence" review, that standard is more than satisfied here. Simply put, the Appellees did everything they needed to—and more—to justify the methodology of apportioning the lake level special assessment rolls at issue here. And that methodology fairly apportions the benefit of re-establishing the Four Lakes—after significant state taxpayers' subsidies of nearly 45% of the Lake Level Capital Project—among those who benefit most from the existence of the lakes.

As the "delegated authority," the FLTF is charged with the obligation to maintain the court-ordered lake levels of the Four Lakes. MCL 324.30702(3), 324.30708(1). To fulfill this duty, "[t]he county may enter into a contract for operation and maintenance of an existing dam." MCL 324.30708(2). To "defray" the costs of maintaining the appropriate lake levels and, thus, any costs related to maintaining a dam, Part 307 gives the FLTF the authority to "compute the cost of the project and prepare a special assessment roll," assessing the costs to the property owners in the judicially created special assessment district. MCL 324.30711. The making, levying and collection

36

of lake level special assessments should conform to the mandates of the Drain Code, MCL 280.1 *et seq*. MCL 324.30705(1). Special assessments for drain improvements, must be based on the special benefits to the assessed land. *Clark v City of Royal Oak*, 325 Mich 298, 313; 38 NW2d 413 (1949); see also *King v Butchbaker*, unpublished per curiam opinion of the Court of Appeals, issued August 9, 2005 (Docket No. 254912). This approach is reflected in the Drain Code, which requires that a special assessment be apportioned according to the benefits derived by each parcel. MCL 280.152; see also MCL 280.151 & MCL 280.262.

It is well-settled, that municipal decisions regarding special assessment are presumed to be valid. *Kadzban v City of Grandville*, 442 Mich 495, 502; 502 NW2d 299 (1993), citing *In re Eight and One-Half Mile Relief Drain*, 369 Mich 641, 649; 120 NW2d 789 (1963); *Crampton v Royal Oak*, 362 Mich 503, 514—16; 108 NW2d 16 (1961). Moreover, "decisions of municipal officers regarding special assessments 'generally should be upheld'" *Id*. at 402, quoting *Dixon Rd Group v Novi*, 426 Mich 390, 403; 395 NW2d 211 (1986).

In *Clark*, the Michigan Supreme Court addressed the issue of special assessments in the context of a drain project and stated:

> It is true that special assessments for a public improvement, such as a drain, must be based on the special benefits to the land assessed therefor. Cross-appellants claim that such benefits must be measured by the enhanced value of the land due to the drain as determined many years after the drain was constructed. This is not correct. Drains are not only for the purpose of improving the land, but are also for improving the sanitation and health of the residents and municipalities of the entire district. *The exact and actual monetary benefit to any individual parcel of land would be difficult to measure and at most can only be estimated with a fair degree of exactness.*

*Clark*, 325 Mich at 313. (emphasis added).

In other words, a drain commissioner is given extensive discretion in preparing the special assessment roll, determining what benefit each parcel of property receives, and is not required to apply a

precise mathematical formula when preparing the special assessment roll. See also *In re Eight and One-Half Mile Relief Drain*, 369 Mich at 648 (quoting *Cummings v Garner*, 213 Mich 408, 433; 182 NW 9 (1921) ("Where the rule of apportionment is according to the special benefits received, the application of that rule may be effected by the employment of *any method which will accomplish that purpose*, whether it be by valuation, frontage, superficial area, or any other method which does not lose sight of the fundamental basis of special assessments for local improvements.") (emphasis added). "In the absence of a readily apparent mistake or abuse of discretion, courts should not attempt to second-guess the administrative board members or municipal officers in whom discretion has been vested and whose expertise inevitably exceeds that of the court." *Charter Twp Of Lansing v Ingham County Drain Commissioner*,  unpublished *per curiam* opinion of the Court of Appeals, issued December 2, 2014 (Docket Nos. 316870 and 318446) (2014 WL 6778948) p4. "There will inherently be a certain amount of arbitrariness in 'many honest and sensible judgments' that 'express an intuition of experience which outruns analysis and sums up many unnamed and tangled impressions; impressions which may lie beneath consciousness without losing their worth,' but in the absence of fraud or a clear adoption of wrong principles, '[s]omewhere there must be an end,' so boards are deferred to within their jurisdiction." *Id.* at 650, quoting *Chicago, B & QR Co v Babcock,* 204 US 585, 598 (1907).

In *King v Butchbaker*, *supra*, landowners contended that under the drain assessment made against their property was unlawful. The landowners asserted that "under the principle of benefits derived relative to assessing or apportioning the cost of a drain project," their property received no benefit from the construction as necessarily and solely reflected by changes in the market value of the property and, further that the method used by the drain commissioner "improperly focused on

property features that contributed to the need for a drain, not the benefits derived or received by way of the drain project." Disagreeing with the property owners, the Court of Appeals stated,

> MCL 280.151 and MCL 280.152 clearly and unambiguously indicate that a drain assessment must be based on an apportionment of benefits and that the apportionment of benefits is based on the principle of benefits derived. The concept underlying special assessments to cover the cost of a public improvement, such as a drain, is that the land upon which an assessment is imposed is peculiarly benefited, and thus the property owner does not pay anything in excess of what the owner receives by reason of such improvement ...
>
> *We find it unnecessary to address plaintiffs' argument that benefits derived must be measured by fluctuation, if any, in the market value of the property that is created when taking into consideration the drain project*. MCL 280.157 provided the board of review the authority 'to hear the proofs and allegations of the parties[,]' yet plaintiffs did not take advantage of the opportunity to submit evidence regarding market value. ...[.]

*King v Butchbaker,* pp *1–2.* (emphasis added).

As the "making, levying, and collection of special assessment" authorized by Part 307 shall conform as nearly as possible to the proceedings for levying special assessment as set forth in the Drain Code, MCL 324.30705(3), the FLTF as the delegated authority, is afforded great deference apportioning the costs in connection with the Lake Level Capital special assessments and the O&M lake level special assessments. In this matter, FLTF exercise its best judgement in preparing the special assessment rolls which fairly and proportionately distributes the costs of the restoration, and operation and maintenance of all four dams. And, like a drain project, Appellants' claims that the benefits derived must be measured by fluctuation, if any, in the market value that is created when taking into consideration the Four Lakes project to restore the lakes following the catastrophic dam failures should be disregarded.

**5.    As With Drain Assessments Under the Michigan Drain Code, Lake Level Special Assessments Under Part 307 Are Not Related to Property Taxes, But Are Exactions Made Through the Counties' Police Power Exercised For the Benefit and Welfare of the Public.**

The Michigan Tax Tribunal Act[89] gives the MTT jurisdiction over: "[A] proceeding for direct review of a final decision, finding, ruling, determination, or order of an agency relating to assessment, valuation, rates, special assessments, allocation, or equalization, under the *property tax laws* of this state." MCL 205.731. The definition of "*property tax laws*" specifically excludes the drain code of 1956. MCL 205.703(f). Drain assessments made under the Drain Code are not related to property taxes but are exaction "through the state's police power as part of the government's efforts to protect society's health and welfare" or "in connection with a regulatory program to defray the cost of such regulation." *Ashely Ann Arbor, LLC v Pittsfield Charter Twp*, 299 Mich App 138, 148; 829 NW2d 299 (2012). As such drain assessments are not special assessments with the usual meaning of the term.

Similarly, lake-level special assessments are exactions through the state's police power as part of a county's efforts to "promote the most benefit to the public; that best protect the public health, safety, and welfare; that best preserve the natural resources of the state; and that best preserve and protect the value of property around the lake." MCL 324.30701(h). In this case, all four dams are high hazard dams that are regulated by the State of Michigan, and must comply with dam safety requirements and regulations, as well as other environmental laws.

A lake-level special assessment may not be imposed on lands not benefited by the lake level improvements. This concept is fundamental to both drain law and Part 307, and is a manifestation of legislative intent,  which provides: "the cost of a [lake level] project to establish

---

[89] Michigan Public Act 186 of the Public Acts of 1973, as amended, MCL 205.701 *et seq*.

40

and maintain a normal level for an inland lake shall be defrayed by special assessments against the following that are benefited by the project: privately owned parcels of land, political subdivisions of the state, and state-owned lands under the jurisdiction and control of the department." MCL 324.30711(1). Just as with drain assessments, in fixing the amount of the lake level special assessment, the delegated authority need not adhere to any precise mathematical formula. And while the computation necessarily must comport with the theory of special benefit derived, it is recognized that, in apportioning the cost of a lake-level project among involved property owners, consideration should be given to all surrounding facts and circumstances tending to throw light on the question as to the extent of the benefits resulting from the improvement. Moreover, while special benefit must be recognized an increase in the value of the land as a consequence of improvements undertaken in the context of the typical street improvement special assessment matter issued pursuant to statutory authority accorded townships and municipalities, see *Dixon Road Group v Novi,* 426 Mich 390; 395 NW2d 211 (1986), the same is not mandated when considering drain improvements or lake-level improvements. The rationale for this difference was highlighted in *Clark*, *supra*, in which the Supreme Court, considering a claim that benefits emanating from a drain project must be measured by the enhanced value to the land, stated:

> Drains are not only for the purpose of improving the land, but are also for improving the sanitation and health of the residents and municipalities of the entire district. The exact an actual monetary benefit to any individual parcel of land would be difficult to measure and at most can only be estimated with a fair degree of exactness. *Id.*

By the same degree, once lake levels are established by the circuit court, Part 307 *mandates* that the delegated authority maintain the lake levels:[90] to promote the most benefit to the public; to best protect the public health, safety, and welfare; to preserve the natural resources of the state;

---

[90] MCL 324.30708(1).

and to preserve and protect the value of property around the lake. (emphasis added). And, like drain assessment, the exact actual monetary benefit to any individual parcel would be difficult to measure.

>    **6.**    **The FLTF Exercised its Best Judgment in Preparing the Lake Level Special Assessment Rolls, Fairly Apportioning the Costs of the Restoration and Operation and Maintenance of the Four Dams to the Property Owners.**

In this case, the FLTF appropriately assessed the costs of the Lake Level Capital Project and the O&M according to the benefit derived by each parcel and did not act arbitrarily and capriciously. The apportionment methodology used in preparing the special assessments rolls to apportion costs to 8,170 parcels involved a comprehensive process over three years and was revised with input received from property owners. The methodology clearly shows that the making and levying the special assessments are proportional and conform to the process under the Drain Code. As Michigan courts have recognized, it is exceedingly difficult to precisely measure the benefit, in monetary terms, that a property owner receives from having property on or near an inland lake. As explained at the January 15, 2024, and information presented to FLTF Board and the Counties, FLTF administration and consultants prepared the assessment that was fair and equitable.  The special assessment rolls fairly and provides for assessments based on the parcels' associated benefits related to the lake restoration capital improvement project and operations and maintenance of the Four Lakes' system. The benefit factors established a base (waterfront or backlot), then took into consideration frontage, water depth, water view and in case of non-residential properties (*i.e.*, commercial marinas, state lands, parks and agriculture) a calculated derived benefit. Proportionately, the special assessment rolls place a higher assessment on properties with greater frontage than those with less frontage. Moreover, the apportionments factors also the quality of lake frontage.

For backlot properties with deeded access, the benefit factors took into consideration the quality of the lake access, reducing the apportionment to accommodate parcels, with poor access (*i.e.*, unmaintained access), limited quality access (*i.e.*, allows for access but not a boat slip) or high-quality access (*i.e.*, allows for boat launching or boat slip). Again, the special-assessment rolls puts a proportionately higher assessment on properties with higher quality access than those that do not.

Appellants claim it is unfair to treat property owners who live upstream of all four dams the same as property owners downstream of all four dams, that the "methodology does not account for the fact that the cost of each dam is different," that there are differing number of parcels "lie around each of the former lakes" or "that a property owner north of the northernmost dam does not likely benefit at all form reconstruction of the southernmost dam". (Appellants' Br, p 14). Aside from the fact that none of the persons or entities listed in the caption of this appeal ever bothered to present any evidence to support whether the foregoing claims would result in a different apportionment, this argument is merely an attempt to second-guess the comprehensive process implemented by FLTF to arrive at fair and proportional lake-level assessments. The 2019 Lake Level Order entered in this matter followed an extensive hearing before this Court. Findings were made that all four lakes and dams were hydraulically and hydrologically interrelated, and the continued operation of the dams were of paramount importance to the environment, recreation, property values of lake. It is simply untrue that the FLSAD was not "arbitrarily drawn." (Appellants' Br, p 15).

The apportionment methodology is a common-sense, straightforward, and well-reasoned approach. A parcel with more lake front property obviously derives more benefit from the lake than someone who does not have lake front property (or who has less). Contrary to Appellants' claims, the

quality of the frontage is factored into the benefit calculation through the measurement of lake view distances, and lake depth. In addition, what should not be lost in the discussion is the fact that Appellants secured over $240 Million for the recovery and restoration of the Four Lakes, of which $182 Million is dedicated to Lake Level Capital Project and represents the public benefit to the Counties and Four Lakes region. Consequently, Appellants' decision to apportion approximately 55% of the remaining costs to property owners that primarily benefit from the existence of the lakes was not contrary to law or arbitrary and capricious.

In the present case, none of the persons/entities presented any substantive information, such as appraisals, at the January 15, 2024 lake level hearing that would support their claims that the methodology for apportioning benefits was arbitrary and capricious. On appeal, Appellants now want to rehash the facts by "cherry picking" 12 parcels and using the values on record with the local assessor to illustrate "property values with the improvement (before the Four Lakes retreated), without the improvement (immediately after the Four Lakes retreated), and today" in order to stake a claim that "the loss of the Four Lakes does not appear to have substantially decrease values within the SAD." (Appellants Br, 16–17). As stated above, this Court should not address Appellants' argument that benefits derived must be measured by fluctuation, if any, in the market value of the property that is created when taking into consideration the lake level project, especially when property owners listed in the caption did not take advantage of the opportunity to submit evidence regarding market value. In any event, the leap in logic is simply absurd, since there are many factors which affect property value, including but not limited to: its location, recent purchases, zoning classification, zoning potential, regional housing supply, environmental aspects (*e.g.*, wetland, floodplain), and whether a parcel is vacant, improved, and type of improvement. In this case, it is simply absurd to suggest that looking at the assessments over a *short* period of time

indicates that proceeding with restoration of the normal level of the Four Lakes does not result in the preservation and protection property values around the lakes or that it will not be a factor in the long-term increase in value of properties around the lake.

Indeed, the information presented by the Appellants is misleading, if not deceptive when compared to similarly situated properties within the FLSAD. Why should a waterfront or backlot owner with an improved lot with the same access as a vacant lot of the same size and with the same access, have to pay more? The apportionment methodology is designed to capture the similarities as well as differences. To illustrate, Appellants identifies Parcel Identification No. 110-230-000-006-00 owned by named Appellants, Robert and Karen Price. It is true that Parcel Identification No. 110-230-000-006-00 is currently vacant and that it is a tributary of the Tittabawassee River. But contrary HCA's claims, this property is waterfront and the apportionment takes into consideration the quality of the access to this property (which is poor). What is also misleading is Appellants' reliance on the SEV to suggest that the special assessment is unlawful. As previously noted, a property's value is influenced by many factors, including the property owners' decisions. For Price, they own several lots within the same subdivision. When you compare the apportionment factors applied to the waterfront vacant lot (*i.e.*, Parcel Identification No. 110-230-000-006-00) to the Price's lot with a home on it (Parcel ID No. 110-230-000-013-10), which is conveniently not listed in the appeal (1619 Maple Point Road), you find that the apportionments are consistent and fair as they reflect the same derived benefit. See **Appellants' Exhibit B**, Appellant Parcel Comparison Data. For illustration purposes, Price's properties are depicted below, pre-2018 as compared today:



(Google Earth, 6-2018)
Compared to this:



(Google Earth, 9/2021)

Additionally, **Appellants' Exhibit C** analyzes the 12 parcels cited by Appellants, and further shows how using SEV is immaterial to the derived benefit. The value of one's land is influenced by the landowners' decisions, as well as recent purchases, zoning classification, zoning potential, regional housing supply, environmental aspects (*e.g.*, wetland, floodplain), and whether a parcel is vacant, improved, and type of improvement. In other words, reliance on recent SEV

46

data to suggest that the restoration of the lakes will not result in any appreciable increase in value to waterfront or backlot properties is unreliable.

### III. Appellants received adequate due process through Part 307's statutorily prescribed notice and public hearing requirements.

#### A. The Appellees complied with all statutorily prescribed process, which meets the minimal constitutional standards of Due Process.

Lastly, Appellants' due-process claim fails. Due process prescribes the constitutional minimum procedures that the government must provide before depriving a person of life, liberty, or property. US Const. Am XIV. The touchstone of due process is notice and an opportunity to be heard. *Reed v Reed*, 265 Mich App 131, 159; 693 NW2d 825, 843 (2005) ("Procedure in a particular case is constitutionally sufficient when there is notice of the nature of the proceedings and a meaningful opportunity to be heard by an impartial decision maker."). Due process if a flexible concept, the essence of which is fundamental fairness. *Id.*

Part 307 provides just that. MCL 324.30714(2) requires that the delegated authority provide a minimum of 10 days of notice through publication in a newspaper in circulation prior to the public hearing, and notice in the manner required under MCL 211.741–746. Here, notice of hearing was mailed to each property owner and published twice in both the *Midland Daily News* and *Gladwin County Record.* [91] The notice provided that in order to appeal the amount of the operation and maintenance assessment and/or capital improvement special assessment, "*any person or entity objecting*" shall appear at the special assessment hearing or file their objection in writing with the FLTF "no later than the close of the public hearing; or any such person or entity may file an appearance and

---

[91] *Id.* and Record #14, Affidavit of Mailing and Positing FLSAD Hearing; Record #15 Affidavit of Publication (*Midland Daily News*); and Record #16, Affidavit of Publication (*Gladwin County Record*).

CLARKHILL\59824\483263\276989361.v1-4/16/24

protest by e-mail to info@fourlakestaskforce.org with "Objection" in the subject line, or by letter" to the FLTF "in which case, his or her personal appearance at the public hearing shall not be required."[92] There is no dispute that FLTF complied with these requirements.

Next, the delegated authority must have a public hearing to approve the special assessment roll. MCL 324.30714(3). On January 15, 2024, FLTF held the lake level special assessment hearing in connection with the O&M and Lake Level Capital Project special assessment rolls.[93] At that time, over 500 people attended the hearing, and there were 109 property owners that spoke and objected to the assessments.[94] The hearing remained open, until there were no additional property owners desiring to speak, submit evidence, or present objections.  In addition, at or before the hearing, the FLTF received 577 written objections.[95]

In addition, although not required under Part 307, prior to hearing date, on December 6, 2023 FLTF held a webinar to inform property owners within the FLSAD of the updated project costs and estimated special assessment amounts for the capital improvements to the lake and costs required for operation and maintenance ("O&M").[96] At that time, FLTF introduced a "virtual map" that was posted online which illustrated the estimated capital and O&M lake level special assessment to each individual parcel in the FLSAD.[97] This "virtual map" allowed any property within the FLSAD to log on and locate their respective property or properties to observe the apportionment benefit factor applied to their

---

[92]Record #13, Notice of Public Hearing.

[93] Record #13, Notice of Lake Level Special Assessment Hearing.

[94] Record #19 FLTF Lake Level Special Assessment Hearing Transcript, pp 25–208.

[95] Record #21 Letters Objecting to Special Assessment.

[96] See https://www.four-lakes-taskforce-mi.com/events.html "December 6, 2023, 5:00–7:00 p.m. | Day of Review Process."

[97] Record #13, Notice of Lake Level Special Assessment Hearing; and special assessment maps https://www.four-lakes-taskforce-mi.com/

property that was used to calculate the lake level special assessment.[98] Additionally, although not mandatory, throughout December 2023 through January 15, 2024, FLTF offered and conducted "one-on-one" virtual meetings with landowners to review apportionment benefit factors affecting their specific properties. During these virtual meetings, and through email or written correspondence, landowners had the opportunity to provide additional information and have their parcel reviewed in connection with the apportionment factors that were applied to their property, to calculate its derived benefit, and also to submit written objections.[99] In the course of the "one-on-one" virtual meetings with landowners, "over 780 adjustments" were made to the roll prior to the January 15 lake level special assessment hearing.[100]

Next, Part 307 requires that the project cost and lake level special assessment roll shall be approved by the county board of commissioners by resolution. MCL 324.30714(3). On February 6, 2024 in a joint meeting of the Gladwin and Midland County Board of Commissioners, the projects costs and lake level special assessment rolls were approved.

Clearly, the Appellees met—and, indeed, exceeded—these standards. Notwithstanding Appellants' jab that such notice took place "during the holiday season," (Appell Br, p 22), the Counties gave **_24 days_** prior notice or more than twice what is required under Part 307. Moreover, as early as October 12, 2023, the FLTF held a webinar open to general public and all property owners in the FLSAD, and at that time, property owners were made aware that that a special assessment hearing in connection with the Lake Level Capital Project would be held in January

---

[98] *Id.* at https://www.four-lakes-taskforce-mi.com/

[99] *Id.*

[100] Record #19 FLTF Lake Level Special Assessment Hearing Transcript, 20:13–25;

2024 and were also provided updates as to estimated costs of the project and financing.[101] Less than two months later, on December 6, 2023, in another webinar again open to the general public and property owners in the FLSAD, property owners were again informed of the special assessment hearing process and specifically, that a special assessment hearing would be held on January 15, 2024. [102] Indeed, the December 6 webinar comprehensively addressed the costs, benefit factors and legal process. Thus, contrary to Appellants' claims, information regarding the timing of the special assessment process was readily available, long before the actual notice of hearing was mailed and published.

Finally, Appellants received a right to judicial review as provided for under both MCL 324.30714(4) and Michigan's Constitution. Const 1963, art 6, § 28. And they availed themselves of that—here. The idea that such processes are constitutionally deficient is devoid of any legal support. And Appellants effectively cite none, failing to identify any case indicating that such procedures are inadequate and conceding that—for most instances—there is no concern with the statutory procedures themselves.

**B.      Many of the Appellants who now complain of inadequate procedures did not even avail themselves of the opportunity to be heard through public comment or by submitting evidence to support their claims.**

Prior to and at the lake level special assessment hearing, the Appellants did not fully avail themselves of the opportunity to be heard or by submitting evidence to the FLTF to support their claims. Indeed, the persons or entities listed in the caption and seeking to set aside the decision of

---

[101] See https://www.four-lakes-taskforce-mi.com/uploads/1/2/3/1/123199575/october_12_2023_webinar_final.pdf, p 15. Appellees' Ex D.

[102] See https://www.four-lakes-taskforce-mi.com/uploads/1/2/3/1/123199575/december_6_webinar_slides.pdf p 21; Appellees' Ex E.

the Appellants either never filed an objection. Or if they did, they did not submit any evidence, and therefore waived their right to contest the procedures under Part 307. Accordingly, Appellants' claim of appeal should be dismissed.

### C. This Court has no authority to rewrite statutory procedures.

Appellants suggest that *Chappell Dam*'s reference to the "flexible" concept of due process somehow gives the Court the authority to rewrite Part 307 concerning its statutorily prescribed procedures for a public hearing and appeal. Not so. This Court remains bound to simply apply Part 307. The sole question is whether the Legislature's prescribed procedures comply with Due Process. They undoubtedly do.

Again, the basic constitutional minimum is notice and an opportunity to be heard. FLSAD owners were permitted an opportunity to provide comments both in writing and during the hearing addressing the impact of the proposed Special Assessment Roll on their individual property. Nothing prevented them from providing the same information now attached to Appellants' brief and arguing for an adjustment to their assessment. The fact that they did not avail themselves of this opportunity does not condemn the procedures themselves as constitutionally non-compliant.

### D. The fact that construction of the project is underway, is not material to the case.

Construction has been underway on the four dams since emergency EGLE orders and permits were issued in 2020. Funding for the construction projects continues to be through government grants and not the Four Lakes Special Assessment District. The final phase has computed the costs necessary to complete the Lake Level Capital Project, which is the portion that will need to be assessed. If the lake level special assessment rolls are set aside. Construction will stop, the dams as they currently exist will need to be stabilized, but the state will not permit the lakes to return. Appellants assert that FLTF should not have started construction until special

assessment roll was approved. (Appellants' Br, p 21.) As noted, in this case, there was no need for a special assessment until the final phase of the lake level, especially when it was clear what was needed to complete the Lake Level Capital Project. The state and federal funding and grants received enabled FLTF to begin the restoration of the dams in phases, which requires significant planning, design, environmental study, value engineering and permitting. To have delayed the process would have been unconscionable. The vast majority of the waterfront and backlot property owners have been waiting nearly four years for their lakes to return. This appeal threatens to prevent that from happening with catastrophic results. Any delay will result in higher costs to these homeowners—or worse, the lakes not returning.

## CONCLUSION AND RELIEF REQUESTED

While the issues addressed in this brief may appear complicated, they are not. HCA and the individual appellants lack standing to sue, and this matter should be dismissed. Additionally, the Legislature created an appeal process under Part 307 but did not intend for courts to second-guess how a delegated authority arrived at its conclusions. Appellants have not sustained their burden to show FLTF and the Counties' decisions were arbitrary. The FLTF exercised its best judgment and expertise in preparing the lake level special assessment rolls which correctly assesses property on a proportional basis. Finally, property owners' received adequate due process, including notice of a hearing, the opportunity to discuss the special assessment roll and present evidence at a public hearing, a further public hearing before the Gladwin and Midland County Board of Commissioners, and this appeal. Those statutorily prescribed procedures—which FLTF and the County Boards followed—clearly satisfy the minimal standards of due process.

This Honorable Court should affirm the February 6, 2024, decisions of the Gladwin and Midland County Board of Commissioners approving the lake level special assessment rolls for the Four Lakes Special Assessment District.

Respectfully submitted,

CLARK HILL PLC

*/s/ Joseph W. Colaianne*
Joseph W. Colaianne (P47404)
Zachary C. Larsen (P72189)
Lauren Burton (P76471)
215 South Washington Square, Ste. 200
Lansing, MI 48933
517-318-3100
jcolaianne@clarkhill.com
zlarsen@clarkhill.com
lburton@clarkhill.com

*Attorneys and Co-Counsel for Appellees*
*Midland County Board of Commissioners,*
*Gladwin County Board of Commissioners, and*
*Four Lakes Task Force*

Dated: April 16, 2024

53

## WORD COUNT STATEMENT

In accordance with MCR 7.111(B), this document complies with the word volume limitation under MCR 7.212(B)(1). Specifically, excluding the parts of the document exempted, this brief contains 15,883 words according to the word-processing system used to produce this document.

Respectfully submitted,

CLARK HILL PLC

*/s/ Joseph W. Colaianne*
Joseph W. Colaianne (P47404)
Zachary C. Larsen (P72189)
Lauren Burton (P76471)
215 South Washington Square, Ste. 200
Lansing, MI 48933
517-318-3100
jcolaianne@clarkhill.com
zlarsen@clarkhill.com
lburton@clarkhill.com

*Attorneys and Co-Counsel for Appellees*
*Midland County Board of Commissioners,*
*Gladwin County Board of Commissioners, and*
*Four Lakes Task Force*

Dated: April 16, 2024

CLARKHILL\59824\483263\276989361.v1-4/16/24