UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

HERON COVE ASSOCIATION, et al.,

       Plaintiffs,                           Case No. 1:24-cv-11473

v.                                              Honorable Thomas L. Ludington
                                                   United States District Judge

GLADWIN COUNTY BOARD OF
COMMISSIONERS and FOUR LAKES
TASK FORCE,

       Defendants.

_____/

**OPINION AND ORDER GRANTING PLAINTIFF'S MOTION TO DISQUALIFY, DISQUALIFYING MYSELF FROM CASE, AND DIRECTING CLERK TO REASSIGN CASE**

On May 19, 2020, the Edenville Dam—which had stood in Mid-Michigan for nearly a century on the Tittabawassee River—failed. The Dam was one of four dams along a 39-mile stretch of the river that together formed the "Four Lakes:" Wixom Lake, Sanford Lake, Smallwood Lake, and Second Lake. When the Edenville Dam failed, its 2,600-acre reservoir—Wixom Lake—was unleashed, causing historic flooding. Thousands of homes, businesses, and public improvements in Gladwin and Midland Counties were damaged or destroyed as a result. Beginning in 2020, state, local, and private parties began recovery efforts such as debris removal and shoreline stabilization. Many people—including myself and my family—contributed their time and effort to assist those whose homes were damaged or destroyed by the flooding.

The Four Lakes Task Force (FLTF), an organization formed before the dam failures due to safety concerns about the dams, led the humanitarian effort for recovery. Subsequently, FLTF also led the effort to seek funding for the reconstruction of the dams. FLTF raised approximately $240 million from state and federal grants, as well as private donations. The remaining funds, it was

determined, would be raised by way of a special assessment paid by property owners of the 8,170 parcels within the Four Lakes Special Assessment District (FLSAD). The special assessments were approved by both the Midland and Gladwin County Boards of Commissioners. Some property owners appealed their assessments to the State Circuit Court.

Subsequently, some of those same property owners—Plaintiffs[1] in this case—became members of the Heron Cove Association (HCA), "a nonprofit corporation formed to represent the interest of certain landowners within the [FL]SAD." ECF No. 9-3 at PageID.160. Shortly after HCA was formed, HCA and its members initiated lawsuits in Midland and Gladwin County Circuit Court[2] challenging the assessment and contending that the special assessment was an unconstitutional taking and a violation of their due-process rights.[3] Both cases were removed to the Northern Division of the United States District Court for the Eastern District of Michigan, where I have served since 2006. Although the cases involve different individual plaintiffs and different county defendants, they are unquestionably companion cases, bringing the same claims related to the same underlying facts.

---

[1] It is not clear whether other FLSAD property owners who have not received an invitation to become members of the Heron Cove Association are necessary parties to the two cases or are otherwise entitled to intervene.

[2] Each case includes a different list of individual Plaintiffs, presumably because the Plaintiffs in this case own property in Midland County, whereas the Plaintiffs in the companion case own property in Gladwin County. *Compare* ECF No. 1-2 *with Heron Cove Association, et al. v. Midland Cnty. Bd. Of Commissioners and Four Lakes Task Force*, 1:24-cv-11458 (June 4, 2024), ECF No. 1-2. But Plaintiffs do not explain this distinction in their respective First Amended Complaints. *See* ECF No. 1-2; *Heron Cove Association, et al. v. Midland Cnty. Bd. Of Commissioners and Four Lakes Task Force*, 1:24-cv-11458 (June 4, 2024), ECF No. 1-2. Of note, there are just over 100 individual Plaintiffs in this case, and over 1,000 in the companion case. *See* ECF No. 1-2; *Heron Cove Association, et al. v. Midland Cnty. Bd. Of Commissioners and Four Lakes Task Force*, 1:24-cv-11458 (June 4, 2024), ECF No. 1-2.

[3] It is also not clear which specific property owners Plaintiffs' Counsel believes are included as members of Plaintiff HCA, because HCA's Articles of Incorporation describe its "members" broadly as "owners of any property along or near" the Four Lakes "or any property in or touching the Four Lakes Special District in or around Gladwin and Midland Counties, Michigan."

Plaintiffs, by Counsel Foster Swift Collins and Smith, PC ("Foster Swift"), seek my disqualification from both cases because my family and I reside on the former Sanford Lake and are included in the Four Lakes Special Assessment District. We did not appeal our assessment. However, as explained below, I will disqualify myself from presiding over this case and direct the Clerk of the Court to reassign this case to another judge of this Court.

**I.**

**A.**

This is not the first time this Court has heard cases related to the May 2020 failure of the Edenville Dam and subsequent flooding. This Court has previously summarized the history of the Edenville Dam's licensure and operation as follows:

> For nearly a century, four dams have sat along a 39-mile stretch of the Tittabawassee River. Starting with the most upstream, they are the Secord, Smallwood, Edenville, and Sanford Dams (the "Dams").
>
> Originally constructed in 1924, the Edenville Dam consists of two earthen embankments spanning the Tittabawassee River and the Tobacco River. The water held by the Edenville Dam forms a 2,600-acre reservoir known as Wixom Lake. Like Sanford Lake, further downstream, Wixom Lake had become a popular recreation site before the Edenville Dam failed, with hundreds of homes and docks lining its shores.
>
> [The Federal Energy Regulatory Commission ("FERC")] is an independent agency tasked with regulating the sale and transmission of electricity under the Federal Power Act (FPA), 16 U.S.C. § 791a *et seq.* In 1998, FERC issued licenses to Wolverine Power Company ("Wolverine") for the generation of hydroelectric power at the Smallwood, Edenville, and Sanford Dams. *See Wolverine Power Corp.*, 85 FERC ¶ 61,063 (1998). Several years later, Wolverine became insolvent, and the Dams and their licenses were purchased by Synex Michigan, LLC, which later became Boyce Hydro Power, LLC ("Boyce"). Ordinarily, FERC would have investigated Boyce's financial capacity to operate the Dam safely before Boyce could purchase it. *See* 16 U.S.C.§ 801 ("No voluntary transfer of any license, or of the rights thereunder granted, shall be made without the written approval of the commission . . . ."); *id.* at § 808(a)(2) (requiring FERC to make certain findings before issuing licenses). But for reasons that remain unclear, FERC never conducted a pretransfer investigation. Instead, in June 2004, FERC issued a short order approving the transfer, which Wolverine and Boyce had finalized nearly a

year beforehand. *See Wolverine Power Corp. Synex Energy Res., Ltd. Synex Mich., LLC*, 107 FERC ¶ 62,266, at 64,498 (2004).

With the license secured, Boyce proceeded to generate electricity at the Edenville Dam for the better part of two decades. It was only a matter of months, however, before Boyce was the target of federal regulators.

Shortly after FERC approved the transfer, Boyce sent a letter to FERC conveying plans to build auxiliary spillways at the Dam. *Boyce Hydro Power, LLC*, 164 FERC ¶ 61,178 at P 5 (2018). The need for additional spillway capacity was old news to FERC. In 1999, FERC sent a letter to Wolverine describing the need for more spillway capacity as its "primary concern." *Id.* at P 4. The fear was that, without additional spillway capacity, the Edenville Dam could not withstand the "Probable Maximum Flood" (PMF), defined as "the flood that may be expected from the most severe combination of critical meteorologic and hydrologic conditions that is reasonably possible in the drainage basin under study." *Id.* at P 3. The "[f]ailure of the Edenville Dam," FERC later warned, "could result in the loss of human life and the destruction of property and infrastructure." *Boyce Hydro Power, LLC*, 162 FERC ¶ 61,115 at P 3 (2018).

Despite assurances, Boyce's plan to increase the Dam's spillway capacity never materialized. On June 15, 2017, after over a decade of project delays, missed deadlines, and "patently deficient" construction proposals, FERC issued a compliance order directing Boyce to submit specific plans for the construction of auxiliary spillways. 164 FERC ¶ 61,178 at P 9; *Boyce Hydro Power, LLC*, 159 FERC ¶ 62,292 at P 2 (2017). When Boyce did not comply, FERC ordered it to stop generating power. *Boyce Hydro Power, LLC*, 161 FERC ¶ 62,119 at P 2 (2017).

Boyce appealed FERC's order to the Court of Appeals for the District of Columbia Circuit, which stayed the order and allowed Boyce to keep generating power. *See In re Boyce Hydro Power*, LLC, No. 17-1270 (D.C. Cir. Feb. 7, 2018). One week later, FERC formally proposed revoking Boyce's license, explaining that Boyce had "failed to meet nearly all the obligations in the Compliance Order, even after Commission staff granted multiple extensions." 162 FERC ¶ 61,115 at P 10.

Boyce did not request an evidentiary hearing or "dispute that it . . . failed to comply with the Commission's directives." 164 FERC ¶ 61,178 at P 40. Instead, it argued that revocation of its licenses was not in the public interest because, inter alia, "revoking the license would not address the Commission's primary concern regarding the inadequate spillway capacity." *Id.* FERC disagreed, noting that once it revoked Boyce's license, regulatory jurisdiction over the Edenville Dam would transfer to the Michigan Department of Environmental Quality, which had its own spillway-capacity standards. *See id.* at P 55.

> On September 10, 2018, FERC revoked Boyce's license for the Edenville Dam. *Id.* at P 1. As anticipated, the Michigan Department of Environmental Quality, now called the Michigan Department of Environment, Great Lakes, and Energy ("EGLE"), assumed jurisdiction over the Dam. But Boyce continued to operate it.

*Allen v. United States*, 572 F. Supp. 3d 411, 414–16 (E.D. Mich. 2021), *aff'd*, 83 F.4th 564 (6th Cir. 2023) (internal footnotes omitted); *see also* ECF No. 1-2 at PageID.36–37 (outlining the same factual history).

In October 2018, Midland and Gladwin Counties each adopted resolutions according to Part 307 of the Michigan Natural Resources and Environmental Protection Act,[4] MICH. COMP. LAWS § 324.20701 *et seq.*, finding it was necessary to establish the normal (legal) levels for all Four Lakes. *See generally* ECF Nos. 10-3; 10-4. To do so, both Counties determined that all costs associated with the maintenance of normal lake levels "shall be defrayed by special assessments,"[5] and appointed the FLTF as the "delegated authority" to "compute the cost of the project and prepare a special assessment roll" on behalf of both County Boards. MICH. COMP. LAWS § 324.30711(1); *see also* ECF Nos. 10-3; 10-4. In 2019, both Counties petitioned the State Circuit Court[6] to "determine normal lake levels and to establish the Four Lakes Special Assessment

---

[4] Part 307 provides for the control and maintenance of inland-lake levels for the benefit and welfare of the public, to best preserve the natural resources of the state, and to best preserve and protect the value of property around a lake. *See* MICH. COMP. LAWS § 324.30701(h); *see also In re Van Ettan Lake*, 386 N.W.2d 572, 576 (Mich. App. 1986) ("[T]he purpose of the Inland Lake Level Act is to provide for the control and maintenance of inland lake levels for the benefit of the welfare of the public."). Accordingly, Part 307 "authorizes counties to make policy decisions as to the levels of their inland lakes, and build and finance dams as necessary to maintain the desired lake levels." *Id.* at 525–26. To this end, lake-level special assessment districts are authorized to issue municipal bonds, notes, and lake-level orders in anticipation of special assessments. MICH. COMP. LAWS § 324.30705.

[5] A special assessment is an assessment charged to a specific group of property owners for a particular public-works project that will specifically benefit those property owners as opposed to the general public. *Fluckey v. City of Plymouth*, 100 N.W.2d 486, 489 (1960).

[6] The petitions were filed jointly in both the Gladwin County Circuit Court and the Midland County Circuit Court. Judge Stephen P. Carras, a Midland County Circuit Court Judge, was appointed to the Gladwin County Circuit Court for the limited purpose of the Counties' joint petitions. *See Price*

District in both Midland County and Gladwin County." ECF No. 1-2 at PageID.37. Midland County Circuit Court Judge Carras considered the Counties' Petition and entered an order establishing normal lake levels for all four lakes and established the boundaries of the FLSAD, which, as noted earlier, includes 8,170 parcels of property in the Four Lakes area. *Id.* at PageID.37; *see also* ECF No. 9-3 at PageID.158.

Also in 2019, Boyce, who sought bankruptcy protection in the Northern Division of the United States Bankruptcy Court for the Eastern District of Michigan, began negotiating the sale of the Edenville Dam to the FLTF and the FLTF "obtained a permit to assess the feasibility of generating power at the Edenville Dam later that year but never sought a license. *See Four Lakes Task Force*, 169 FERC ¶ 62,124 (2019)." *Allen v. United States*, 572 F. Supp. 3d 411, 416 (E.D. Mich. 2021), *aff'd*, 83 F.4th 564 (6th Cir. 2023).

"[O]n May 19, 2020, several days of historic rainfall raised the water level three feet above its previous maximum, triggering the [Edenville Dam]'s failure. As the dam's left embankment fell, forty thousand acre-feet of water rushed forward. The flood overwhelmed [the Sanford Lake] dam downstream, forcing eleven thousand residents to evacuate," and causing over $200 million in damage. *Bruneau v. Michigan Dep't of Env't*, 104 F.4th 972, 974 (6th Cir. 2024); *see also* Hayes, Jason, *One Year After the Edenville Dam Failure*, MACKINAC CTR. FOR PUB. POL'Y (May 21, 2021), https://www.mackinac.org/one-year-after-the-edenville-dam-failure [https://perma.cc/5MHC-D8BH].

---

*v. Cnty. of Gladwin*, No. 363327, 2024 WL 132918, at *1 (Mich. Ct. App. Jan. 11, 2024) (noting Judge Carras was "assigned by the State Court Administrative Office (SCAO) to serve as a judge of the Gladwin Circuit Court to assist with the docket in the" corresponding Gladwin County case).

**B.**

After the failure of the Edenville Dam, the FLTF began "acquiring, remediating, repairing, and reconstructing dams necessary to restore Secord, Smallwood, Wixom, and Sanford Lakes." ECF No. 9-3 at PageID.157. The FLTF received a total of $240 million in state and federal grants and private donations "which allowed [it] to begin the restoration of the dams, but the public was also informed [that] additional funds would be needed to complete restoration of the lakes." *Id.* These additional funds were to be collected by special assessment from the FLSAD, which was established in 2019 before the Dam failure. *Id.*; *see also supra* Section I.A. Initially, the estimated amount to be collected by special assessment was approximately $70 million, but by late 2023, the cost of the restoration project had grown to nearly $400 million, $217 million of which would be collected through special assessment. ECF No. 9-3 at PageID.158.

Midland County Circuit Court Judge Michael J. Beale summarized the process the FLTF utilized to apportion the special assessment as follows:

> FLTF developed their current methodology for apportionment throughout 2023 with the assistance of Spicer Group, an engineering firm, to allocate the cost of the restoration and maintenance of the dams to achieve the determined lake levels. The apportionment formula includes five factors: base benefit, derived benefit, frontage, waterfront view, and water depth. FLTF held a webinar on December 6, 2023 to update property owners [within the FLSAD] as to the finalized cost of the project, cost for ongoing operation and maintenance, and the estimated special assessment amount by application of the apportionment formula. A virtual map was created and mad accessible for property owners to see their expected assessment amount. FLTF held additional [individual] virtual meetings with property owners throughout December 2023 and early January 2024 to discuss the apportionment methodology and assessments for those landowners.

ECF No. 9-3 at PageID.158.

As required by Michigan law, *see* MICH. COMP. LAWS § 324.30701 *et seq.*, the FLTF scheduled a public hearing for January 15, 2024 at which FLSAD property owners could object to the assessment for their property. ECF No. 9-3 at PageID.158; *see also* MICH. COMP. LAWS §

324.30714(2)–(4) (requiring public hearing and notice). The FLTF mailed notice of the hearing to each FLSAD property owner, published notice in local newspapers, posted notice in the county office buildings, and published notice on the Gladwin and Midland County websites. ECF No. 9-3 at PageID.158–59. Some 500 written objections were received before the hearing and just over 100 property owners attended the January 15 hearing to voice their concerns. *Id.* at PageID.159. "The objections were addressed at the public hearing and the special assessment roll was finalized for submission to the Midland County and Gladwin County Board[s] of Commissioners." *Id.* Both County Boards of Commissioners approved the proposed special-assessment rolls at a joint meeting on February 6, 2024. *Id.*

## C.

Six days after the Gladwin and Midland County Boards of Commissioners approved the special-assessment rolls, Heron Cove Association filed Articles of Incorporation. HCA is "a nonprofit corporation formed to represent the interest of certain landowners within the [FL]SAD." ECF No. 9-3 at PageID.160. HCA was incorporated in Michigan on February 12, 2024 "to protect the Four Lakes, the watersheds, and the interest of its members, and advocate those interests in any cause or controversy." MICH. DEPT. OF LICENSING AND REGUL. AFFS., Business Entity Summary, Heron Cove Association Certificate of Amendment to the Articles of Incorporation (Feb. 27, 2024), https://cofs.lara.state.mi.us/CorpWeb/CorpSearch/CorpSearchFormList.aspx?SEARCH_TYPE=3 (last visited July 16, 2024) (click "view PDF"). According to Article VII of HCA's Articles of Incorporation, "qualifications of members, the manner of their admissions to the corporation, the termination of membership and voting by the members shall be in accordance with the provisions of the bylaws of the corporation." MICH. DEPT. OF LICENSING AND REGUL. AFFS, Business Entity Summary, Heron Cove

Association Articles of Incorporation (Feb. 12, 2024), https://cofs.lara.state.mi.us/CorpWeb/CorpSearch/CorpSearchFormList.aspx?SEARCH_TYPE=1 (last visited July 16, 2024). The bylaws of HCA are not included in its pleadings, and it is not known how HCA makes its decisions or how Foster Swift anticipates its legions of clients will make decisions. Notably, Nicholas J. Stock II is listed as the incorporator and Plaintiffs' Attorney Michael D. Homier is listed as the Registered Agent. Homier and Stock are both attorneys with Foster Swift, and each identify the firm's Grand Rapids office address as their address on all HCA filings with the State of Michigan.

Eight days after filing their Articles of Incorporation, HCA filed a generic appeal of the Special Assessment Rolls approved by both Midland and Gladwin County Boards of Commissioners, not apparently connected to any of the specific objections raised by people subject to the Special Assessment. ECF No. 9-3 at PageID.159; *see also* MICH. COMP. LAWS § 324.30714(4) (authorizing appeal of Special Assessment Rolls "within 15 days after county board approval."). HCA argued that FLTC and Midland and Gladwin Counties violated their due process rights and challenged "the FLTF's apportionment and methodology and the Counties' approvals of the special assessment rolls" under Part 307 of the Michigan Natural Resources and Environmental Protection Act, MICH. COMP. LAWS § 324.20701 *et seq.* ECF No. 9-3 at PageID.163; *see also* ECF No. 10-9 at PageID.299–314. HCA sought a court order vacating the Special Assessment Rolls and a "reapportionment of the special assessment roll so that the assessments are proportional to the increase in market value derived from the Project." ECF No. 10-9 at PageID.314.

Oral argument on HCA's appeal was held on May 29, 2024. *See* ECF No. 9-3 at PageID.157. One month later, Judge Michael J. Beale denied HCA's appeal finding appellants "failed to carry their burden [to] show the special assessments [were] not supported by competent,

material and substantial evidence," *id.* at PageID.169. Judge Beal noted that FLTF "not only followed the procedures enacted by the [Michigan] legislature to protect the due process rights of [property owners in the FLSAD], but did more through the holding of public webinars, the creation of the virtual map for property owners to view, and posting notice of the hearing in more places than required[.]" *Id.* at PageID.162–63.

**D.**

On March 20, 2024, while HCA's appeal of the Special Assessment Rolls was pending before the Midland County Circuit Court, Plaintiffs HCA, "on behalf of its members" and over 100 individual HCA members filed this action in Midland County Circuit Court against the Midland County Board of Commissioners and the FLTF. *See* ECF No. 1-1 at PageID.5–21. Plaintiffs lodge four counts against Defendants, notwithstanding the fact that their principal factual assertion—that all residents of Gladwin and Midland Counties should have been included in the assessment district[7]—is disconnected from their legal theories and causes of action. The four counts are as follows:

| COUNT | CLAIM |
|---|---|
| I. | Inverse Condemnation in Violation of the Takings Clause of the Michigan Constitution |
| II. | Inverse Condemnation in Violation of the Takings Clause of the U.S. Constitution. |
| III. | Violation of Procedural Due Process under the Michigan Constitution |
| IV. | Violation of Procedural Due Process under the U.S. Constitution |

On June 4, 2024, Gladwin County Board of Commissioners removed the case to this Court. ECF No. 1. On July 9, 2024, both Gladwin County Board of Commissioners and the FLTF filed

---

[7] On this point, Plaintiffs allege that "[b]y its own words, FLTF acknowledges that the Four Lakes provide a significant number of jobs to the region, presumably to community members who do not own parcels with private access to the water and who remain untouched by any special assessment . . . [b]ut even though the Four Lakes, and therefore the Dams, greatly benefit these properties and municipalities, they are not assessed." ECF No. 1-2 at PageID.42.

- 10 -

motions to dismiss Plaintiffs' Complaint, arguing it is barred by collateral estoppel and res judicata and, alternatively, arguing Plaintiffs failed to state a valid claim. *See generally* ECF Nos. 9; 10. FLTF also filed a motion seeking expedited consideration of Defendants' motions to dismiss, noting that the delay caused by this litigation "will result in lost construction bids, increased costs, and will further delay financing," which, collectively, will mean higher assessments to property owners" within the FLSAD. ECF No. 11 at PageID.415. The next day, Plaintiffs filed a motion seeking my disqualification from presiding over this case because my wife and I own property on Sanford Lake that is part of the FLSAD. ECF No. 12.

## II.

Due process of law requires that "a neutral and detached judge" decide cases. *Ward v. Village of Monroeville*, 409 U.S. 57, 62 (1972). A judge must recuse where his or her "impartiality might reasonably be questioned." 28 U.S.C. § 455(a).[8] And a judge must recuse when "he knows that he . . . or his spouse . . . has a financial interest in the subject matter in controversy or in a party to the proceeding, or any other interest that could be substantially affected by the outcome of the proceeding." 28 U.S.C. § 455(b)(4).

Yet "a judge must not recuse himself unless the law *requires* him not to preside over a particular case." *James v. Cuyahoga Cnty.*, No. 1:21-CV-01958, 2023 WL 2445112, at *1 (N.D. Ohio Mar. 10, 2023) (emphasis added) (citing *Garrett v. Ohio State Univ.*, 60 F.4th 359, 371 (6th Cir. 2023)). Indeed, the canons of judicial conduct direct that a "judge should hear and decide

---

[8] Notably, before Congress broadened the recusal statute in 1974, the relevant inquiry for a judge's disqualification in a particular case was the judge's "subjective self-assessment of bias." *James v. Cuyahoga Cnty.*, No. 1:21-CV-01958, 2023 WL 2445112, at *2 (N.D. Ohio Mar. 10, 2023) (citing *Liljeberg v. Health Servs. Acquisition Corp.*, 486 U.S. 847, 860–61 (1988)). The language of the statute now, however, requires "an objective assessment from the perspective of a reasonable person fully informed of all facts and circumstances, giving less solicitude to a judge's impartiality than the judiciary might." *Id.*

matters assigned, unless disqualified." Code of Conduct for U.S. Judges, Canon 3(A)(2).

Notably, the criteria for disqualification under 28 U.S.C. § 544 are general, and subject to different interpretations. As a former state-circuit-court judge and current United States District Court Judge, I recognize that judges in more rural locations and judges in metropolitan locations view the issues differently. Simply stated, it is far more difficult for judges in smaller or rural locales to routinely disqualify themselves based on personal relationships without materially disrupting their docket, and materially delaying litigants.

### III.

There are two potential rationales for my disqualification in this case: (1) charitable contributions for flood aid provided by foundations I am involved with; and (2) my and my wife's financial interest in the property we own on the former Sanford Lake, which is subject to a Special Assessment. Each rationale will be addressed below.

First, although not raised by Plaintiffs,[9] *see* ECF No. 12, I am Trustee and Secretary for the Rolin M. Gerstacker Foundation ("Gerstacker Foundation"), which made charitable contributions in the aftermath of the flood. The first occurred in May of 2020, when the Gerstacker Foundation issued a grant of $200,000.00 to the United Way of Midland County to assist families impacted by the disastrous flooding. The second was a $1,000,000.00 grant to the FLTF—a Defendant in this case—to help stabilize the four dams and study the flood impacts. Additionally, and unrelated to the Gerstacker-Foundation grants, my family's foundation—the Ludington Family

---

[9] Although Plaintiffs do not raise this rationale in their motion, the rationale is notable because Plaintiffs raised a similar argument when seeking Judge Stephen Carras's disqualification from presiding over the state court special-assessment appeal. *See* Pl. Mot. to Disqualify Judge Carras, *Heron Cove Association v. Midland*, 2024-2751-AA (March 19, 2024, 42nd Circuit Court, Midland Cnty., Mich.). Plaintiffs argued for Judge Carras's disqualification in that case because he is a trustee for the Herbert H and Grace A. Dow Foundation, which donated "at least $1 million to efforts supporting the [FLTF]." *Id.*

Foundation—contributed $10,000.00 in December 2020 to the Rise Together Fund, a fund managed by the Midland Community Foundation to assist those impacted by the flooding.

All three of these charitable contributions were intended to address humanitarian concerns in the immediate aftermath of the floods and *not* the later efforts of FLTF to make special assessments. Accordingly, these donations, in my view, cannot reasonably be construed as an endorsement of the FLTF's special assessment initiative to reconstruct the dams, as Plaintiffs appear to concede by omitting this rationale from the disqualification motion. Thus, these contributions do not warrant my disqualification.

Plaintiffs' primary argument for my disqualification is the fact that my wife and I own property on the former Sanford Lake, which is part of the FLSAD. ECF No. 12. Specifically, Plaintiffs argue that this ownership results in reasonable questions regarding my impartiality because I have a financial interest that could be affected by the outcome of these proceedings. *Id.* at PageID.427. On this front, they are correct: I must disqualify myself from this case. Any decision made in this case could be viewed as favoring my personal interests as a property owner in the FLSAD over the interests of other FLSAD property owners.[10] This is especially true here because—as Defendants have emphasized throughout their Midland County Circuit Court appeal—"decreases in the apportionment of one property or class of properties" *necessarily requires* "an increase to the other properties." Pl. Brief on Appeal at 28, *Heron Cove Association v. Midland*, 2024-2751-AA (Apr. 16, 2024, 42nd Circuit Court, Midland Cnty., Mich.). In other words, if one property owner's special assessment is decreased, other property owner's

---

[10] Although I do believe I am able to set aside my personal interests and preside impartially over this case, continuing to preside over it would risk an additional appeal that would likely delay a final disposition on the merits, which could result in "lost construction bids, increased costs, and" further delays in financing related to the reconstruction project such that it would result in even higher assessments to FLSAD property owners. ECF No. 11 at PageID.415.

assessments must increase.[11] *Id.* For this reason, I must disqualify from presiding over this case, and the clerk of the court will be directed to reassign this case—including Defendants' motions to dismiss, ECF Nos. 9; 10, and FLTF's Motion for Expedited Consideration, ECF No. 11—to another judge of this Court.

IV.

Accordingly, it is **ORDERED** that Plaintiffs' Motion to Disqualify, ECF No. 12, is **GRANTED**.

Further, it is **ORDERED** that pursuant to 28 U.S.C. § 455, I hereby **DISQUALIFY** myself from the above-captioned case.

Further, it is **ORDERED** that the Clerk of the Court is **DIRECTED** to **REASSIGN BY BLIND DRAW** the above-captioned case and its companion case, *Heron Cove Association, et al. v. Midland Cnty. Bd. Of Commissioners and Four Lakes Task Force*, 1:24-cv-11458, to another judge of this Court.

Dated: July 17, 2024           s/Thomas L. Ludington
THOMAS L. LUDINGTON
United States District Judge

---

[11] Notably, in addition to requiring my disqualification, this zero-sum issue begs the question of how Plaintiffs—who filed the Complaint in their individual capacity and as members of HCA by vote of the members—believe they may ethically be represented by the same law firm. Indeed, a conflict of interest is inherent *among* the more than *1,000 total Plaintiffs* (in this case and its companion case), just as there is a conflict of interest that requires my disqualification from presiding over this case. *See* Michigan Rule of Professional Conduct 1.7 ("[A] lawyer shall not represent a client if the representation of that client will be directly adverse to another client[.]").